# EXHIBIT "A"

STATE OF WISCONSIN      CIRCUIT COURT      MARATHON COUNTY

KOLBE & KOLBE MILLWORK CO., INC.
1323 South 11th Avenue
Wausau, Wisconsin 54401,

                                             Case No. _____
          Plaintiff,                             Case Code:  30303

        v.

UMR, INC.
11 Scott Street, Suite 100
Wausau, Wisconsin  54403-4808,

          Defendant.

## COMPLAINT

     Plaintiff Kolbe & Kolbe Millwork Co., Inc., by its attorneys, Boardman & Clark LLP, as and for its complaint against defendant, states and alleges as follows:

### THE PARTIES

     1.      Plaintiff Kolbe & Kolbe Millwork Co., Inc. ("Kolbe Millwork") is a Wisconsin corporation with its principal place of business at 1323 South Eleventh Avenue, Wausau, Wisconsin 54401.

     2.      Kolbe Millwork is a manufacturer of specialty doors and windows.

     3.      UMR, Inc. ("UMR") is a Delaware corporation doing business in Wisconsin with its principal place of business at 11 Scott Street, Suite 100, Wausau, Wisconsin 54403.  UMR is authorized to and does conduct business in Wisconsin.

     4.      The President and CEO of UMR, Inc. is Jay Anliker and his office is located at 11 Scott Street, Suite 100, Wausau, Wisconsin 54403.

## JURISDICTION AND VENUE

5.      This court has jurisdiction and this matter is properly venued in Marathon County,

Wisconsin pursuant to Wis. Stat. §801.50 as being the county in which the contract between the

parties was entered into, its performance was to be accomplished, and the breach occurred, and

the county where defendant resides and does business.

## KOLBE'S ADMINISTRATIVE SERVICES AGREEMENT WITH UMR

6.      Kolbe Millwork is an employer.  Kolbe Millwork employs approximately 1,100

people.  Eighty-five percent of Kolbe Millwork's employees make less than $42,000 per year.

7.      Kolbe Millwork sponsors the Kolbe & Kolbe Health and Welfare Benefit Plan

(the "Plan"), a self-funded employee welfare benefit plan under ERISA, for the benefit of its

eligible employees and their eligible dependents.  The Plan is a separate and independent legal

entity from Kolbe Millwork.

8.      The Plan provides coverage of medical expenses incurred by eligible employees

of Kolbe Millwork and their eligible dependents.

9.      Kolbe Millwork's general assets are used to pay for benefits under the Plan.

10.     Since January 1, 2000, Kolbe Millwork has contracted with UMR or its

predecessors Wausau Benefits, Inc. ("Wausau Benefits") and Fiserv Health Plan Administrators,

Inc. ("Fiserv Health") to provide administrative services to the Plan as a third-party administrator

pursuant to an Administrative Services Agreement.

11.     The Administrative Services Agreement was entered into effective January 1,

2000 between Kolbe Millwork and Employers Insurance of Wausau, which subsequently became

Wausau Benefits.

2

12.     After January 1, 2000, the Administrative Services Agreement was amended periodically. A true and correct copy of the Administrative Services Agreement and the amendments to that agreement with confidential fee information redacted is attached as Exhibit A (collectively "Administrative Services Agreement").

13.     With the 2006 renewal, effective June 1, 2006, Wausau Benefits, Inc. changed its name to Fiserv Health Plan Administrators, Inc., which was also known as Fiserv Health.

14.     With the 2009 renewal, effective January 1, 2009, the parties amended the Administrative Services Agreement to indicate that Fiserv Health Plan Administrators, Inc. is now known as UMR, Inc.

15.     UMR has continued to serve as Kolbe Millwork's third-party administrator under the existing Administrative Services Agreement as amended.

16.     UMR is a subsidiary of United HealthCare Services, Inc.

17.     UMR is the largest employee benefits third-party administrator in the United States. It has locations and service centers in at least eight states: Wisconsin, Illinois, Iowa, Florida, Kentucky, Ohio, Texas, and Washington.

18.     UMR processes annually more than 65 million claims that are valued at more than $6.8 billion.

19.     UMR works with hundreds of health and welfare plans. Nearly all of UMR's claims administration services are provided to self-funded plans.

## UMR'S DUTIES UNDER THE ADMINISTRATIVE SERVICES AGREEMENT

20.     The Administrative Services Agreement provides that it shall be governed by and construed in accordance with the laws of the State of Wisconsin. (§15.9)

3

21.     Under the Administrative Services Agreement, UMR promised Kolbe Millwork that it would provide ministerial administrative services and claims administration in connection with the operation and administration of the Plan. (Recitals; Performance Standards, ¶1)

22.     UMR agreed to "arrange payment of any Benefits, all in accordance with the requirements of Schedule A [Performance Standards]." (§6.1)

23.     Kolbe Millwork agreed to "establish a special account designated for the purpose of paying Claims for Benefits under this Agreement" and to give UMR "the necessary nonexclusive authority to utilize any funds in said account for payment of Benefits under the Plan." (§3.1)

24.     Kolbe Millwork agreed to "make an initial deposit in said account as of the effective date of this Agreement, and . . . make such additional deposits as are necessary to enable [UMR] to pay all Benefits under the Plan and to comply with the terms of this Agreement." (§3.1)

25.     UMR agreed that "[p]ayments shall be made by [UMR] with [Kolbe Millwork's] funds on behalf of [Kolbe Millwork] . . . ." (§6.1)

26.     UMR agreed to comply with the "Performance Standards" outlined in Schedule A to the Administrative Services Agreement. (§§4.1, 6.1)

27.     Under these Performance Standards, UMR agreed (among other things) to "administer all managed care Claims per the terms and conditions of any contract(s) executed, directly or indirectly, between [Kolbe Millwork] and any third party health care related provider." (Performance Standards, ¶10)

4

## KOLBE'S CONTRACTS WITH THIRD-PARTY HEALTH CARE PROVIDERS

28.    Kolbe Millwork contracted indirectly with various third-party health care providers for those providers to provide services to beneficiaries under the Plan at specified contractual rates.

29.    Kolbe Millwork arranged these contracts through various Network Administrators, including North Central Health Care Alliance, Inc. ("NCHA") and Bowers & Associates, Inc. d/b/a Paradigm Network ("Bowers").

30.    Kolbe Millwork entered into contracts with Network Administrators such as NCHA and Bowers that allowed Kolbe Millwork to benefit from the agreements that those Network Administrators had with third-party health care providers.

31.    NCHA and Bowers as Network Administrators entered into contracts with various third-party health care providers, including The Medical College of Wisconsin, Inc. ("Medical College") and Children's Hospital of Wisconsin, Inc. ("Children's Hospital").

32.    Under these contracts, the third-party health care providers agreed to provide services at a specified contractual rate to eligible beneficiaries of the health plans of various employers (such as Kolbe Millwork) that were specifically identified in the contracts.

## NCHA AGREEMENTS

33.    NCHA entered into a Physician Agreement with Medical College, which was initially effective October 1, 1997 and which has been in effect since that date, subject to an amendment effective July 1, 2003 ("NCHA-Medical College Agreement").  A true and correct copy of the NCHA-Medical College Agreement with confidential discount information redacted is attached as Exhibit B.

5

34.     The NCHA-Medical College Agreement lists Kolbe Millwork as an employer entitled to receive specified contractual rates for services provided to eligible beneficiaries.

35.     The NCHA-Medical College Agreement also provides that each employer identified in the contract is a third-party beneficiary of the agreement.

36.     Kolbe Millwork entered into a Member Agreement with NCHA, which was initially effective January 1, 2003 and which has been in effect since that date ("NCHA-Kolbe Agreement").

37.     The NCHA-Kolbe Agreement allows Kolbe Millwork to benefit from the agreements that NCHA has with third-party health care providers, including the NCHA-Medical College Agreement.

## BOWERS AGREEMENTS

38.     Bowers entered into a Provider Agreement with Children's Health System and its Affiliated Entities, which was initially effective April 1, 2001 and which has been in effect since that date (the "Bowers-Children's Provider Agreement").  A true and correct copy of the Bowers-Children's Provider Agreement with confidential discount information redacted is attached as Exhibit C.

39.     Children's Hospital is an affiliated entity of Children's Health System and performs services pursuant to the Bowers-Children's Provider Agreement.

40.     Bowers entered into a Physician Agreement with Children's Medical Group, which was initially effective February 1, 2003 and which has been in effect since that date (the "Bowers-Children's Physician Agreement").  A true and correct copy of the Bowers-Children's Physician Agreement with confidential discount information redacted is attached as Exhibit D.

6

41.     Under the Bowers-Children's Provider Agreement and the Bowers-Children's Physician Agreement (collectively, the "Bowers-Children's Agreements"), Kolbe Millwork is identified as an employer entitled to receive specified contractual rates for services provided to eligible beneficiaries.

42.     The Bowers-Children's Agreements each provide that Kolbe Millwork is a third-party beneficiary of the agreement.

43.     Kolbe Millwork entered into a Services Agreement with Bowers, which was initially effective January 1, 2007 and which has been in effect since that date ("Bowers-Kolbe Agreement").

44.     The Bowers-Kolbe Agreement allows Kolbe Millwork to benefit from the agreements that Bowers has with medical providers, including the Bowers-Children's Agreements.

### UMR'S BREACHES OF THE ADMINISTRATIVE SERVICES AGREEMENT

45.     At all relevant times hereto, Scott Gurzynski ("Gurzynski") was an employee of Kolbe Millwork.

46.     On or about August 2, 2007, K.G., the daughter of Gurzynski and Melissa Persike ("Persike"), was born with serious health conditions.

47.     On or about August 20, 2007, Gurzynski submitted to Kolbe Millwork an incomplete Employee Enrollment/Change Form on which Gurzynski listed K.G. and indicated his desire to change his health coverage from single coverage to "employee plus one" coverage but did not answer questions related to plan eligibility.

48.     Over several months in 2007 and 2008, Kolbe Millwork made numerous inquiries of Gurzynski and Persike (who were not married and were not living together) to attempt to

7

obtain information which Kolbe Millwork determined was necessary to make a determination regarding K.G.'s eligibility under the terms of the Plan.

49.     Gurzynski and Persike did not provide Kolbe Millwork with the information that Kolbe Millwork determined was necessary to make a determination regarding K.G.'s eligibility under the terms of the Plan or complete the enrollment form.

50.     Kolbe Millwork notified Gurzynski by letter dated June 24, 2008 of its determination that K.G. was not eligible for coverage, and that any claims submitted to the Plan since January 1, 2007 would be reprocessed.

51.     K.G. had been treated as an inpatient at Children's Hospital, with services provided by physicians of Medical College and/or Children's Medical Group, on at least four separate occasions in 2007 and 2008 before Kolbe Millwork made a final determination that K.G. was not eligible for coverage.

52.     Medical College and Children's Hospital submitted claims for these services to UMR, as Kolbe Millwork's third-party administrator, seeking payment from Kolbe Millwork.

53.     On or about November 28, 2007, Kolbe Millwork contacted UMR and told it to hold off on paying any claims submitted for services provided to K.G.

54.     On or about November 29, 2007, Kolbe Millwork indicated to UMR that K.G. might not be eligible under the Plan and to hold all claims until a determination could be made by Kolbe Millwork.

55.     On or about November 28, 2007, Kolbe Millwork also informed UMR that K.G. might be receiving Title 19 and SSI benefits, which would have also provided an indication to UMR that there was a question regarding K.G.'s eligibility under the Plan.

8

56.     On or about December 11, 2007, a representative of Kolbe Millwork both spoke with and wrote to UMR and communicated that Kolbe Millwork was still investigating K.G.'s coverage. He indicated to UMR that he understood that the providers needed to be paid and that UMR could process the pending claims for services provided to K.G. provided that if the facts dictated that K.G. was not covered, the claims could be reprocessed and refunds obtained.

57.     Approximately two days later, UMR sent Children's Hospital a check for $414,376.59.

58.     UMR made subsequent payments to both Children's Hospital and Medical College for services provided to K.G.

59.     UMR ultimately paid Children's Hospital $1,203,885.88 for claims for services provided to K.G. and paid Medical College $472,263.24 for medical treatment given to K.G. between August 2007 and June 2008.

60.     Kolbe Millwork would not have made the payments to Children's Hospital and Medical College if it had know that a refund would not be available if the facts dictated that K.G. was not covered under the Plan.

61.     Prior to making the payments subsequent to the December 11 communications, UMR did not inquire with Kolbe Millwork regarding the status of the determination of K.G.'s eligibility under the Plan or seek Kolbe Millwork's permission to pay the claims.

62.     Upon information and belief, prior to making the payments to Children's Hospital and Medical College for services provided to K.G., UMR did not review the NCHA-Medical College Agreement or the Bowers-Children's Agreements to determine whether refunds would be available under the terms of those agreements if facts dictated that K.G. was not covered under the Kolbe Plan.

9

63. Prior to making the payments to Children's Hospital and Medical College for services provided to K.G., UMR did not indicate to either health care provider that Kolbe Millwork was still investigating coverage for K.G.

64. Prior to making the payments to Children's Hospital and Medical College for services provided to K.G., UMR did not verify with either provider that if facts dictated that K.G. was not covered under the Plan, the claims could be reprocessed and Kolbe Millwork could obtain a refund.

65. UMR made the payments to Children's Hospital and Medical College by sending a check on behalf of Kolbe Millwork using a checking account that was funded by Kolbe Millwork using Kolbe Millwork's general assets.

66. Along with each payment made to Children's Hospital and Medical College, UMR created and sent a document called a "Remittance Advice," which contained columns labeled "Charged Amount," "Allowed Amount," "Discount Managed Care Adjust," and "Paid."

67. UMR did not indicate on the "Remittance Advice" documents or the checks themselves that the payments were being made for claims submitted for services provided to K.G. but Kolbe Millwork would make a later determination of K.G.'s eligibility for benefits under the Kolbe Plan and would seek a refund if it determined there was no coverage for K.G.

68. UMR acted as Kolbe Millwork's agent in all of UMR's contacts with Children's Hospital and Medical College regarding K.G.

69. As Kolbe Millwork's agent, UMR owed a duty of absolute fidelity and loyalty to the interests of Kolbe Millwork and to exercise the skill, care, prudence, and diligence that a third-party administrator in like capacity and familiar with such matters would exercise in good

10

faith in performance of its duties.  UMR, as Kolbe Millwork's agent, had the duty to protect and

serve the best interests of Kolbe Millwork.

70.     Kolbe Millwork reposed its trust and confidence in UMR to perform as Kolbe

Millwork's agent and exercise the skill, care, prudence, and diligence that a third-party

administrator in like capacity and familiar with such matters would exercise in good faith in

performance of its duties.

71.     UMR failed to exercise the requisite skill and care to protect Kolbe Millwork's

interests with respect to the claims made by Medical College and Children's Hospital for

services provided to K.G.

## UMR'S FAILURE TO OBTAIN A REFUND

72.     Under the Administrative Services Agreement, as amended effective January 1,

2006, UMR agreed to seek refunds from providers as follows (§ 6.9) (emphasis added):

> In the event payment is made to or on behalf of an ineligible
> Covered Person who was retroactively terminated, or if an
> overpayment was made to a provider or Covered Person, [UMR]
> shall make an attempt to recover any payment over One Hundred
> Dollars ($100) by sending an initial request letter to the provider
> and/or Covered Person requesting the funds back. . . .
>
> If [Kolbe Millwork] approves sending an overpayment file to the
> outside recovery agency and/or outside legal counsel, [Kolbe
> Millwork] will be responsible for paying the applicable
> commission of the outside recovery agency and/or outside legal
> counsel, **unless the overpayment arises out of or is based upon
> [UMR's] intentional, willful, reckless or negligent acts or
> omissions in the performance of its duties under this
> Agreement**.

73.     After a final determination on K.G.'s eligibility was made by Kolbe Millwork,

UMR, on behalf of Kolbe Millwork, made demands of Medical College and Children's Hospital

to return all overpayments made with respect to services provided to K.G.

11

74.     Medical College refused to return any overpayments.  Children's Hospital returned overpayments of $6,478.93, but refused to refund any other overpayments.

75.     Upon information and belief, UMR did not charge Kolbe Millwork a claims reprocessing fee.

76.     Kolbe Millwork approved and hired outside legal counsel to pursue the overpayments made by UMR to Medical College and Children's Hospital for services provided to K.G.  That litigation is ongoing.

77.     During the course of that litigation, the District Court for the Western District of Wisconsin ruled that the NCHA-Medical College Agreement and the Bowers-Children's Agreements do not permit Kolbe Millwork to receive a refund from Medical College and Children's Hospital for payments made for persons determined to be ineligible after payments were made to providers, and the court refused to order Children's Hospital or Medical College to refund the payments made by UMR for services provided to K.G.

78.     UMR promised Kolbe Millwork to administer all claims per the terms and conditions of any contract executed directly or indirectly between Kolbe Millwork and any third-party health care provider.

79.     UMR failed to administer the claims related to services provided to K.G. by Children's Hospital and Medical College per the terms and conditions of the NCHA-Medical College Agreement and the Bowers-Children's Agreements by failing to inform those providers that Kolbe Millwork was still investigating coverage for K.G. and by failing to ensure that a refund would be granted if K.G. were later determined to be ineligible for coverage prior to paying the claims for services provided to K.G.

12

80.    UMR's failure to administer the claims related to services provided to K.G. by Children's Hospital and Medical College per the terms and conditions of the NCHA-Medical College Agreement and the Bowers-Children's Agreements was a reckless or negligent act or omission in the performance of UMR's duties under the Administrative Services Agreement.

81.    UMR's payment of Medical College's and Children's Hospital's claims for services provided to K.G. without indicating that the payments were subject to a later determination of K.G.'s eligibility for benefits under the Kolbe Plan and confirming that refunds would be provided if the facts dictated that K.G. was not covered was a reckless or negligent act or omission in the performance of UMR's duties under the Administrative Services Agreement.

### BREACH OF CONTRACT

82.    Kolbe repeats and realleges paragraphs 1 through 81.

83.    UMR breached its duties under the Administrative Services Agreement with Kolbe Millwork in providing services under that agreement related to claims made by Children's Hospital and Medical College for services provided to K.G., including but not limited to breaching Sections 4.1, 6.1, 6.9 and Schedule A (Performance Standards).

84.    UMR was reckless or negligent in its acts or omissions in the performance of its duties under the Administrative Services Agreement, including but not limited to, causing Kolbe Millwork to hire outside counsel to pursue refunds of payments made from Kolbe Millwork's general assets to Children's Hospital and Medical College for an ineligible person, K.G.

85.    As a direct result of UMR's breaches of the Administrative Services Agreement, Kolbe Millwork has suffered damages, including but not limited to, payment of attorney's fees and litigation expenses incurred in pursuing a refund of these overpayments, as well as other damages.

13

WHEREFORE, plaintiff Kolbe Millwork respectfully demands judgment as follows:

A.    Awarding damages to compensate Kolbe Millwork for its losses arising from UMR's breach of contract;

B.    Awarding damages to compensate Kolbe Millwork for legal expenses incurred by Kolbe Millwork in pursuing a refund of the overpayments from Medical College and Children's Hospital;

C.    Such other and further relief as authorized by law.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated this 31st day of July, 2013.

BOARDMAN & CLARK LLP
By:

Sarah A. Zylstra, State Bar No. 1033159
Andrew N. DeClercq, State Bar No. 1070624
One South Pinckney Street, Suite 410
P.O. Box 927
Madison, Wisconsin 53701-0927
Telephone: (608) 257-9521
Facsimile: (608) 283-1709
szylstra@boardmanclark.com
adeclercq@boardmanclark.com

*Attorneys for Plaintiff Kolbe & Kolbe Millwork Co., Inc.*

F:\DOCS\WD\33676\5\A1700982.DOCX

14

Kolbe
Copy

## ADMINISTRATIVE SERVICES AGREEMENT

Name:     KOLBE & KOLBE MILLWORK CO INC

Address:  1323 S 11TH AVE
          WAUSAU WI 54401

Health:   7671-00-010140



EXHIBIT

tabbies

A

ADMINISTRATIVE SERVICES AGREEMENT

|  | Page |
|---|---|
| Recitals | 1 |
| Section 1 - Definitions | 1 |
| Section 2 - Term and Termination | 1 |
| Section 3 - Responsibilities of The Plan Sponsor | 2 |
| Section 4 - Responsibilities of Wausau | 3 |
| Section 5- Enrollment Services | 3 |
| Section 6 - Claim Services | 3 |
| Section 7 – Subrogation Services | 4 |
| Section 8 – Reports and Records | 4 |
| Section 9 - Fees | 5 |
| Section 10 – Relationship of Parties | 5 |
| Section 11 - Indemnification | 6 |
| Section 12 - Warranty | 7 |
| Section 13 - Arbitration | 7 |
| Section 14 - Confidentiality | 8 |
| Section 15 – General Provisions | 8 |
| Exhibit A - Fee Structure | |
| Addendum – Preferred Provider Organization | |
| Schedule A – Performance Standards | |

# ADMINISTRATIVE SERVICES AGREEMENT

This Agreement is entered into by and between KOLBE & KOLBE MILLWORK CO INC, hereinafter called the "Plan Sponsor," and EMPLOYERS INSURANCE OF WAUSAU A Mutual Company, hereinafter called "WAUSAU".

# RECITALS

The Plan Sponsor has established one or more employee benefit plans to provide certain benefits on a self-funded basis to its Participants (as defined in Section 1.3), and Participants of any subsidiary or affiliated corporations that have adopted such plan.

The Plan Sponsor has requested that WAUSAU provide certain ministerial administrative services in connection with the operation and administration of such plan(s), and WAUSAU is willing to provide such services in accordance with the terms and conditions of this Agreement.

In consideration of the mutual covenants and agreements contained herein, the parties hereby agree as follows:

## Section 1:  Definitions

1.1    "Benefit" shall mean any amount payable under the terms and conditions of the Plan.

1.2    "Claim" shall mean every written request received by WAUSAU for the payment of benefits under the Plan.

1.3    "Participant" shall mean all eligible employees and/or retired employees of the Plan Sponsor and their eligible dependents, as defined in the Plan, together with any individual who has exercised his or her right to continue coverage under the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1986.

1.4    "Plan" shall mean the self-funded medical or dental benefit plan(s) sponsored by the Plan Sponsor for Participants.

1.5    "Plan Year" shall mean the plan year as defined in the Plan.

## Section 2:  Term and Termination

2.1    This Agreement shall be effective January 1, 2000, and shall continue in effect until January 1, 2001.  This Agreement shall automatically renew each Plan Year thereafter for successive one (1) year terms unless terminated as hereinafter provided.

2.2    This Agreement may be terminated by either party upon giving written notice thereof to the other party at least one hundred twenty (120) days prior to the expiration of the current Plan Year.

2.3    This Agreement shall automatically terminate in the event that:

a.    The Plan Sponsor's Plan is discontinued; or

b.    The Plan Sponsor fails to maintain the bank account if so required pursuant to Section 3 hereunder or fails to provide sufficient funds with which to pay claims under the Plan after being provided with notice of default and thirty (30) days right to cure; or

c.    Plan Sponsor becomes insolvent or makes an assignment for the benefit of creditors or commits an act of bankruptcy or files or has filed against it a petition in bankruptcy or reorganization proceedings or similar legal device; or

d.    The Plan Sponsor fails to pay WAUSAU the service fee as required in Section 8 when due after being provided with notice of default and fifteen (15) days right to cure.  If any part of the service fee is disputed, the Plan Sponsor will pay WAUSAU the undisputed portion of the service fee as provided herein.  The Plan Sponsor may withhold the disputed portion of the service fee during the pendency of such dispute, during which time the parties agree to use their best efforts to resolve the dispute.

2.4    Notwithstanding anything to the contrary stated in Sections 2.1 through 2.3, the Plan Sponsor shall be entitled to terminate this Agreement during the term of this Agreement or any renewal thereof in the event:

     a.    WAUSAU fails to perform, or performs inadequately, any of its material obligations under this Agreement, as outlined in Schedule A. In such event, the Plan Sponsor shall send WAUSAU written notice of failure to perform including in such notice sufficient detail of such failure to perform to enable WAUSAU to correct such failure. WAUSAU shall be granted thirty (30) working days after receipt of such notice to cure such failure;

     b.    The Plan Sponsor and/or any other party who has a contract for the delivery of services with WAUSAU and the same management consultant utilized by the Plan Sponsor (initially North Central Health Alliance hereinafter called "NCHA") have accrued, in any one Plan Year, an aggregated credit amount greater than or equal to the credit amount stated in paragraph 3(A) of Schedule A to this Agreement. In such event, the Plan Sponsor shall be entitled to terminate this Agreement upon notice to WAUSAU;

     c.    WAUSAU has been provided more than three (3) notices of default within any twelve (12) month period, regardless if such defaults had been cured or not;

     d.    WAUSAU has committed a material breach if its obligations of confidentiality as required by this Agreement;

     e.    WAUSAU becomes insolvent or makes an assignment for the benefit of creditors or commits an act of bankruptcy or files or has filed against it a petition in bankruptcy or reorganization proceedings or similar legal device applicable to insurance companies.

2.5    During the term of this Agreement, WAUSAU will process all Claims received by WAUSAU subsequent to the effective date set forth in Section 2.1, regardless of the date on which the Claim was incurred. As consideration for this service, Plan Sponsor shall pay WAUSAU the fee set forth in Exhibit A of this Agreement.

2.6    Claims received by WAUSAU prior to the effective date of termination of this Agreement, but not processed by WAUSAU as of said date, shall be returned, without processing, to the Plan Sponsor.

Claims received after the effective date of termination of this Agreement shall be returned, without processing, to the Plan Sponsor.

2.7    Any right to recover payment of any amounts due WAUSAU under this Agreement shall survive any cancellation or termination of this Agreement.

**Section 3: Responsibilities of the Plan Sponsor**

3.1    The Plan Sponsor shall establish a special account designated for the purpose of paying Claims for Benefits under this Agreement, and WAUSAU shall be given the necessary nonexclusive authority to utilize any funds in said account for payment of Benefits under the Plan.

The Plan Sponsor shall make an initial deposit in said account as of the effective date of this Agreement, and shall make such additional deposits as are necessary to enable WAUSAU to pay all Benefits under the Plan and to comply with the terms of this Agreement.

3.2    Any record keeping, reporting, or payment responsibilities set forth under any state's unclaimed property law shall be those of the Plan Sponsor, notwithstanding this Agreement being in effect or having been terminated at the time such responsibilities arise.

3.3    The Plan Sponsor shall review all disputed claims and shall instruct WAUSAU to grant or deny payment of such disputed claims.

**Section 4:  Responsibilities of WAUSAU**

4.1     In consideration of the payments required to be made by the Plan Sponsor hereunder, WAUSAU shall deliver the services specifically described in Schedule A which is attached hereto and incorporated herein by reference in its entirety, any additional services described in this Agreement and any services described in WAUSAU's Response to a Request for Proposal.  In the event of any conflict, the terms of Schedule A shall control over the provisions of this Agreement and the terms of this Agreement shall control over the provisions of the Proposal.

4.2     WAUSAU utilizes certain administrative procedures in the performance of its obligations under this Agreement, and WAUSAU will instruct the Plan Sponsor's designated personnel in the implementation of these procedures.  Such procedures shall be in compliance with the requirements of Schedule A.  WAUSAU shall provide the Plan Sponsor and/or its designee with advance notice and adequate information and training regarding such procedures.  WAUSAU shall not modify such procedures except upon at least sixty (60) days prior written notice to Plan Sponsor and its designee.

4.3     WAUSAU will have no obligation to arrange for payment of Benefits under the Plan if the Plan Sponsor has not made the requisite funds available to WAUSAU in accordance with this Agreement.

**Section 5:  Enrollment Services**

5.1     During the course of this Agreement, WAUSAU will review enrollment forms and change forms for all employees and dependents of the Plan Sponsor at the time of enrollment and after any change in eligibility status.

5.2     WAUSAU will notify Plan Sponsor of the eligibility status of all employees and dependents.  In the case of an employee or dependent who is denied coverage under the terms of the Plan, WAUSAU will notify the employee or dependent of the denial, and of the right to appeal the denial.  WAUSAU will also send notice of all eligibility denials to the Plan Sponsor.  Review of any disputed denials and final decisions on the eligibility status of any employee or dependent shall be the responsibility of the Plan Sponsor.

5.3     WAUSAU will provide two standard ID cards (including replacement cards) for each employee who is covered under the Plan Sponsor's health plan.  The Plan Sponsor may, at its option, order customized ID cards for Participants.  If the Plan Sponsor elects to provide customized ID cards, the Plan Sponsor agrees that it will be responsible for the cost of such ID cards.

5.4     WAUSAU will provide the following enrollment services:

a.   For each employee and dependent participating in the Plan, WAUSAU will make an initial determination regarding whether such employee or dependent is eligible for benefits under the terms of the Plan.

b.   For all Participants enrolled under the Plan, WAUSAU shall make the following determinations, pursuant to the terms of the Plan:

- The effective date of coverage.

- The applicable class of coverage.

- The type of coverage (single/employee plus one/family).
- The Plan(s) under which there is coverage (health/dental).

**Section 6:  Claim Services**

6.1     During the course of this Agreement, WAUSAU shall review initial Claims, determine the amount of Benefits, if any, to which a Participant is entitled, under the terms of the Plan, and arrange payment of any Benefits, all in accordance with the requirements of Schedule A.  Payments shall be made by WAUSAU with the Plan Sponsor's funds on behalf of the Plan Sponsor in accordance with the terms of this Agreement and the Plan.  Review of any disputed claims, and decisions on the disposition of any such Claims, shall be the responsibility of the Plan Sponsor.

6.2   WAUSAU will accept only those Claims submitted in accordance with the rules and procedures established pursuant to Section 4.2 above, and will review Claims and determine Benefits in accordance with the requirements of the Plan and the rules and procedures established by WAUSAU for the administration of Claims, to the extent that such rules and procedures do not conflict with the requirements of the Plan.

6.3   WAUSAU shall promptly notify the Plan Sponsor and/or its designated management consultant of any disputed Claims and other Claims or class of Claims as the Plan Sponsor shall so designate, including Claims involving: a question with respect to qualification of Claims submitted under the terms of the Plan; a question with respect to the amount due; and any disputed Claim with an analysis of the issues to assist the Plan Sponsor in reaching a decision regarding such Claim.

6.4   In no event shall WAUSAU become a "holder" of unclaimed property, as defined in any applicable unclaimed property law, due to the failure of a Participant to negotiate any check issued from the account described in Section 3.1.   The Plan Sponsor agrees that any obligations arising under such applicable unclaimed property law rests with the Plan Sponsor and not with WAUSAU.

6.5   The parties understand and agree that any Claim made by a Participant on or subsequent to the effective date of this Agreement, under any provision of the plan previously administered for the Plan Sponsor by another third party claims administrator and canceled as of January 1, 2000 shall be administered hereunder and paid in accordance with the terms of this Agreement.

6.6   WAUSAU will identify and aggressively pursue all coordination of benefits opportunities where a Participant has coverage other than under the Plan.   WAUSAU does not represent or guarantee that it will discover each and every coordination of benefits opportunity.

## Section 7: Subrogation Services

7.1   WAUSAU agrees to provide the Plan Sponsor with certain clerical services with respect to the Plan's subrogation provisions.   Such clerical services shall include, but not be limited to:

   a.   Contacting the claimant to determine the applicability of the subrogation provisions;

   b.   Notifying the claimant or his or her representative of the Plan's subrogation provisions;

   c.   Reserving any rights the Plan may have to recovery under the subrogation provisions; and

   d.   Requesting repayment under the Plan's subrogation provision.

7.2   In providing the above services, WAUSAU does not represent or guarantee that its attempt at collection will be successful on each and every subrogation claim.   The Plan Sponsor shall be ultimately responsible for such pursuit and collection.

7.3   If WAUSAU is unsuccessful in its initial collection attempts under Section 7.1, it shall refer the matter to the Plan Sponsor.   In no event will WAUSAU provide the Plan Sponsor with legal services or advice with respect to any subrogation recovery, and the Plan Sponsor shall be responsible for the retention of and payment for such services.

7.4   WAUSAU may, in its own discretion, decline to pursue subrogation claims that fall below $500.   Such declination shall in no way affect the Plan Sponsor's right and ability to pursue such subrogation claims.

7.5   Any amount collected by WAUSAU under the Plan's subrogation provision shall not reduce the services fee provided for in this Agreement.

## Section 8: Reports and Records

8.1   WAUSAU will maintain records and information regarding Claims filed pursuant to this Agreement and determinations made thereon for so long a period of time as WAUSAU deems appropriate, but in no case less than two (2) calendar years.   WAUSAU may retain such records or information, by microfilm or otherwise, or destroy such records or information at its option, in accordance with its current or future record retention practices.   However, at the Plan Sponsor's request, WAUSAU shall not destroy said records but shall provide them to the Plan Sponsor at the Plan Sponsor's expense.

-4-

8.2    Upon the termination of this Agreement, WAUSAU will provide the Plan Sponsor with a report showing the current Benefit status of all Participants. WAUSAU may make an appropriate and reasonable charge to cover the cost of producing this report.

8.3    During the term of this Agreement, the Plan Sponsor may inspect its records in WAUSAU's custody at reasonable times during normal business hours and upon reasonable advance notice to WAUSAU.

8.4    Upon the termination of this Agreement, WAUSAU will retain the current Claim records or information for a period of twelve (12) months. At the end of this twelve (12) month period, WAUSAU may retain or destroy all or part of such records or information at its option. However, at the Plan Sponsor's request, WAUSAU shall provide said records to the Plan Sponsor at the Plan Sponsor's expense.

8.5    Except as necessary to cooperate in the defense of lawsuits as provided in Section 10, WAUSAU shall have no duty under this Agreement to reconstruct individual Claim files or to return individual Claim files to the Plan Sponsor.

8.6    WAUSAU will periodically provide the Plan Sponsor with reports showing Benefits paid on behalf of the Plan Sponsor.

## Section 9: Fees

9.1    As compensation for the Services rendered by WAUSAU under this Agreement, the Plan Sponsor shall pay WAUSAU the fees and amounts required pursuant to Exhibit A, which is incorporated by reference in its entirety, subject to any credits obligated to be provided pursuant to Schedule A.

9.2    The service fees shall be calculated and payable monthly throughout the term of this Agreement.

9.3    Notwithstanding Section 9.1 above, fees are subject to change when:

    a.    The terms of the Plan change;

    b.    The number of employees changes by fifteen percent (15%) or more from the average number of employees upon which the original quotation for this Agreement was based; or

    c.    A division, subsidiary, or affiliated company is added/deleted from the Plan.

## Section 10: Relationship of Parties

10.1    WAUSAU does not represent, nor has it represented, this Agreement to be an insurance policy or an indemnity Agreement. It is the intent of both parties to this Agreement, that this Agreement is a contract for the sale of services only, and not a contract of indemnity.

10.2    It is understood and agreed that WAUSAU is retained by the Plan Sponsor only for the purposes and to the extent set forth in this Agreement, and the relationship of WAUSAU to Plan Sponsor for purposes of this Agreement shall be that of an independent contractor.

10.3    It is the intent of both parties to this Agreement that the funds utilized in accordance with this Agreement are not insurance premiums and shall in no event be construed to be insurance premiums. In the event that state premium taxes become due and payable hereunder, the Plan Sponsor agrees to reimburse WAUSAU, upon demand, for the payment of any such taxes, and any penalties or interest on any such amounts, due to late payment of said taxes. It is agreed that this paragraph and the Plan Sponsor's obligations expressed herein shall survive termination of this Agreement or the Plan Sponsor's Plan.

10.4    It is understood and agreed that WAUSAU is not a fiduciary with respect to the Plan, as defined under Section 3(21) of the Employee Retirement Income Security Act of 1974 (ERISA), and that WAUSAU is retained under this Agreement to perform ministerial functions, not discretionary functions as clarified in Department of Labor regulations under ERISA at 29 C.F.R. S2509.75-8, D-2.

10.5    It is understood and agreed that the Plan Sponsor retains all final authority and responsibility for the Plan and its operation.

10.6      During the term of this Agreement, WAUSAU shall procure and maintain Worker's Compensation insurance in statutorily required amounts. WAUSAU shall provide the Plan Sponsor with proof of insurance for same, at the Plan Sponsor's request.

In the event any of the Services subject to this Agreement are performed on the premises of the Plan Sponsor or its management consultant (including, without limitation, NCHA), WAUSAU shall maintain the following insurance coverage with a carrier licensed to transact business in the State of Wisconsin, and shall provide that such policies name the Plan Sponsor and NCHA (or such other management consultant as the Plan Sponsor shall designate) as an additional insured thereunder. Such insurance coverages are as follows:

| TYPE OF COVERAGE | COVERAGE REQUIRED |
|---|---|
| Comprehensive General Liability | $500,000 Bodily Injury and Property Damage or occurrence or claim and $1,000,000 in aggregate (or $1,000,000 combined single limit coverage). |

## Section 11: Indemnification

11.1      WAUSAU's liability under this Agreement is limited to the provision of services enumerated herein. In no event shall WAUSAU be liable from its own funds for the payment of Benefits under the Plan or for any other payment not expressly provided for in this Agreement.

11.2      The Plan Sponsor shall be liable for and shall protect, save harmless, defend, and indemnify WAUSAU, its agents, and employees from and against all fines, penalties, loss, damage, costs, expenses, attorneys fees and court costs suffered by WAUSAU, its agents, and employees, for which WAUSAU, its agents, or employees may be held or become liable for any reason arising out of the Plan or this Agreement.

11.3      The provision in Section 11.2 shall not apply to any such fines, penalties, loss, damage, costs, expenses, attorneys fees and court costs resulting from the negligence of WAUSAU or its failure to comply with the requirements of this Agreement.

11.4      Except as otherwise provided in paragraph 11.3, in no event shall WAUSAU be liable for punitive damages caused by or resulting from its performance hereunder, or any decision of the Plan Sponsor to deny the payment of any Claim for Benefits under the Plan. The Plan Sponsor shall be liable for, and shall protect, save harmless, and indemnify WAUSAU from any such punitive damages.

11.5      Under no circumstances shall WAUSAU be liable to employees of the Plan Sponsor for Benefits payable under the Plan. In the event of a dispute between WAUSAU and any employee of the Plan Sponsor as to the payment of any Claim, or as to the amount due the employee covered by the Plan, the disagreement shall be finally determined by the Plan Sponsor, and WAUSAU shall accept such determination. WAUSAU shall immediately notify the Plan Sponsor of the occurrence of any such dispute.

11.6      If any suit shall be brought with respect to any Claim for benefits under the Plan, WAUSAU shall immediately notify the Plan Sponsor of such suit, and shall have no further responsibility for the defense of such suit, but shall cooperate with the Plan Sponsor in its defense of such suit. If WAUSAU is named as a defendant in any such suit and incurs charges for the services of counsel to have WAUSAU dismissed as a defendant in such suit, the Plan Sponsor shall reimburse WAUSAU for expenses incurred in seeking and obtaining any such dismissal. Any judgment resulting from said suit requiring the payment of Benefits or damages under the Plan shall be paid by the Plan Sponsor. The Plan Sponsor agrees to reimburse WAUSAU for expenses incurred in connection with the defense of said suit.

11.7      WAUSAU shall only have the right to settle any Claim upon the consent of the Plan Sponsor or its designated management consultant. The Plan Sponsor or its designated management consultant may, from time to time, provide reasonable standards relating to WAUSAU's settlement of minor and/or disputed claims of a similar nature. WAUSAU shall advise the Plan Sponsor and its designated management consultant of the status and result of any such settlements. Any such settlement shall be paid solely from the Plan Sponsor's funds. Any payment by WAUSAU shall be binding as between the parties hereto and WAUSAU shall have no liability to the Plan Sponsor for or as a result of any payment made by WAUSAU hereunder.

11.8     WAUSAU shall not be liable to the payee or endorsee of any instrument, or to any banking institution, relating to any instrument issued against any bank account established by the Plan Sponsor pursuant to the requirements of Section 3.1. The Plan Sponsor hereby agrees to indemnify WAUSAU for any such liability relating to such bank account. WAUSAU will be liable to the Plan Sponsor only for willful misconduct, bad faith, intentional fraud or negligence of WAUSAU's employees in issuing such instruments, relating to such *ok* bank account.

11.9     Plan Sponsor has directed WAUSAU to release Participant's medical information to its designated management consultant, for the purpose of performing certain medical management services on Plan Sponsor's behalf. Plan Sponsor agrees to hold WAUSAU harmless for any and all fines, penalties, loss, damage, costs, expenses, attorneys fees, and court costs suffered by WAUSAU, its agents or employees, for which WAUSAU or its agents or employees have been or may be held liable for any reason arising out of the release of Participants medical information to such management consultant.

11.10     WAUSAU agrees to indemnify, defend, and hold the Plan Sponsor, its officers, agents, representatives and employees, harmless from and against all claims for bodily injury or property damage arising out of the actions of WAUSAU's employees, officers, and agents.

    WAUSAU agrees to indemnify, defend, and hold the Plan Sponsor, its officers, agents, representatives, and employees, harmless from and against all employment related claims made by WAUSAU's employees, including without limitation, Worker's Compensation, Unemployment Compensation, health benefits, wages, and retirement benefits.

    WAUSAU agrees to indemnify, defend, and hold the Plan Sponsor, its officers, agents, representatives and employees, harmless from and against all claims arising out of any violation of WAUSAU's obligations to maintain confidentiality, as enumerated in Section 14 of this Agreement.

## Section 12: Warranty

WAUSAU hereby warrants and represents to the Plan Sponsor as follows.

12.1     That any work products delivered to the Plan Sponsor pursuant to the requirements of this Agreement, including, without limitation, all material, analysis, data programs and other services will be original work developed pursuant to this Agreement and must be approved by WAUSAU (excepting reports issued relating to claim review and adjudication may be prepared by third-party medical specialist retained by WAUSAU for such services). These work products may be designed by WAUSAU if requested by the Plan Sponsor.

12.2     That it is free to perform its obligations under this Agreement without interference from any third party and that its performance hereunder will not cause a default in any other agreement which it may have.

12.3     That it is a Mutual Insurance Company, properly constituted and validly existing and that this Agreement is a binding contract on it.

12.4     Unless required by law or a valid order of a regulatory body with appropriate jurisdiction that it shall not take, and shall act to prevent any officers, agents, or employees from taking, in any action, making any statement or omitting to take any action or making any statement which would, or is likely to, disparage the name and/or reputation of the Plan Sponsor.

## Section 13: Arbitration

13.1     Any unresolved difference of opinion between WAUSAU and the Plan Sponsor with respect to the interpretation of this Agreement or the performance of the obligations hereunder shall be submitted to arbitration in accordance with this Section 13.

13.2     Each party shall select an arbitrator within one (1) month after written request for arbitration has been received from the party requesting arbitration. These two arbitrators shall select a third arbitrator within ten (10) days after both have been appointed. Should the arbitrators fail to agree upon a third arbitrator, each arbitrators shall select one name from a list of the three names submitted by the other arbitrator, and a third arbitrator shall be selected by lot between the two names chosen. None of said arbitrators shall be related to either party or have any interest, directly or indirectly, personally or otherwise, in the questions decided.

13.3   The expense of arbitration proceedings conducted hereunder shall be born equally by the parties.   All arbitration proceedings hereunder shall be conducted in Wausau, Wisconsin, unless otherwise agreed.

13.4   Arbitration may be conducted by one arbitrator if the parties so mutually agree.

13.5   The arbitration shall be conducted in accordance with the American Arbitration Association Rules and shall render their decision with a view to affecting the intent of this Agreement.  The decision of the majority of the arbitrators shall be final and binding on the parties and may be enforced by either party in any court of record having jurisdiction over the subject matter and over the party against whom enforcement is sought.  The arbitrators shall be authorized to award costs.

## Section 14:  Confidentiality

14.1   WAUSAU acknowledges that all information and materials (together with any information regarding any "Participant") which is provided by the Plan Sponsor or is provided by any third party related in any way to any Participant or the Plan Sponsor's Plan is highly confidential ("Confidential Information").   Such information may be in oral, written, or physical form and may include personnel and/or medical information of a confidential nature.

14.2   WAUSAU shall limit access to Confidential Information to those of its employees and/or officers who have a need to know in order to effectuate this Agreement.  WAUSAU shall exercise the highest diligence with its officers, agents, and employees respective confidentiality obligations pursuant to this Agreement.  WAUSAU shall be fully liable for any breach of its or their obligations regarding medical records pursuant to this paragraph) by any officer, agent or employee.

14.3   On an intermittent basis and upon the Plan Sponsor's request, WAUSAU shall deliver to the Plan Sponsor each and every copy of any written or physical embodiments (including all copies) of Confidential Information then in WAUSAU's possession for specific individual Claim files.

14.4   WAUSAU shall not sell, transfer, publish, disclose, display or otherwise make any reports issued pursuant to this Agreement, or parts thereof, available to any third party without the Plan Sponsor's prior written approval (except as otherwise specifically authorized pursuant to this Agreement).

14.5   Confidential Information shall not be deemed to be generally available to the public or WAUSAU's possession merely because it may be embraced by a more general disclosure, or merely because it may be derived from combinations of disclosures generally available to the public or in WAUSAU's possession.

14.6   WAUSAU, its officers, agents and employees, shall comply in all respects with all confidentiality requirements of any federal, state, or local law, rule or regulation affecting the access, review, dissemination or utilization of any medical record of any Participant together with any additional reasonable requirements which may be established by the Plan Sponsor.

14.7   No publicity releases (including news releases and other advertisements) relating to this Agreement shall be issued by WAUSAU without the prior written approval of the exact release.  WAUSAU shall not issue any reports and/or technical paper, article, publication or other announcement containing or otherwise referencing this Agreement, any Confidential Information and/or the Plan Sponsor without the Plan Sponsor's prior written consent.

## Section 15:  General Provisions

15.1   This Agreement may be modified, altered, or amended only by a writing signed by an authorized officer of each of the parties.

15.2   A forbearance or pattern of forbearances by either party of the other party's failure to cooperate or otherwise comply with the terms of this Agreement or the procedures prescribed hereunder shall not be deemed a waiver of its rights hereunder, nor shall it be deemed a modification of this Agreement or of said procedures.

15.3   This writing, including the body of the Agreement and any addenda attached hereto, shall constitute the entire Agreement of the parties and no agent or employee of either party has authority to change this Agreement or waive any of its provisions except as otherwise expressly provided herein.

15.4    Neither party may assign any of its rights or obligations under this Agreement without the written consent of the other party.

15.5    The captions and headings throughout this Agreement are for convenience and reference only, and the words contained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision, or to the scope or intent, of this Agreement.

15.6    WAUSAU warrants that, in the performance of this Agreement, it, and each of its officers, agents, and employees, shall abide by all applicable laws and regulations in any way affecting its duties, obligations, and operations relating, in any way whatsoever, to the delivery of services pursuant to this Agreement.

15.7    WAUSAU is an independent contractor and neither WAUSAU nor WAUSAU's personnel are, or shall be deemed, employed by the Plan Sponsor or its management consultant.   WAUSAU shall have no right to bind or otherwise represent the Plan Sponsor in any manner whatsoever, including without limitation regarding any medical claims, except as expressly authorized by this Agreement.

15.8    Any termination, cancellation, or expiration of this Agreement notwithstanding, provisions which are intended to survive and continue shall so survive and continue, including but not limited to, the provisions of Section 14.

15.9    This Agreement shall be governed by and construed in accordance with the laws of the State of Wisconsin.

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates indicated below.

EMPLOYERS INSURANCE OF WAUSAU                     KOLBE & KOLBE MILLWORK CO INC
A Mutual Company

By _____                By _Michael Tomeyck_____

Title _Senior Vice President_____                 Title _Vice President - Finance_
      _Wausau Benefits_

Date _May 16, 2000_____                 Date _2-23-00_____

# ADDENDUM

## PREFERRED PROVIDER ORGANIZATIONS

### 7671-00-010140

1.  WAUSAU agrees to provide Participants with access to the following Preferred Provider Organization: PHCS Healthy Directions and addition of Associates for Health Care effective April 1, 2000.  Participants utilizing the PPO will remain free to choose any doctor or hospital in or out of the PPO.

2.  Plan Sponsor agrees to provide certain Benefit incentives to Participants who utilize PPO doctors and hospitals. In exchange for these incentives, PPO doctors and hospitals have agreed to discounts, per diems or fee schedules for all services provided.

3.  Plan Sponsor will pay WAUSAU a monthly access fee as set forth in EXHIBIT A.  This monthly fee shall be in addition to the fee charged under Section 9.1 of this Agreement.


This ADDENDUM is hereby incorporated into the Administrative Services Agreement entered into between KOLBE & KOLBE MILLWORK CO INC and EMPLOYERS INSURANCE OF WAUSAU A Mutual Company, effective January 1, 2000.


IN WITNESS WHEREOF, the parties have signed this ADDENDUM on the dates indicated below.


EMPLOYERS INSURANCE OF WAUSAU                KOLBE & KOLBE MILLWORK CO INC
A Mutual Company

By _____                   By _Michael Tomryea_____

Title _Senior Vice President_                 Title _Vice President - Finance_
       Wausau Benefits
Date _May 16, 2000_                           Date _2-23-00_

**SCHEDULE A**

**PERFORMANCE STANDARDS**

This Schedule A is attached to that certain Administrative Services Agreement, effective on the 1st day of January 2000, and is by and between WAUSAU and the Plan Sponsor (the "Agreement"). The terms and conditions of the Agreement, including the definition for any defined terms, shall apply to this Schedule A. To the extent that this is a conflict between the language of this Schedule A and the Agreement, this Schedule A shall control.

1.   **Services**

WAUSAU shall provide certain Claims administration services relating to the benefits provided under the Plan Sponsor's Plan in accordance with the requirements of this Schedule A and the Agreement.

2.   **Plan Payment Accuracy and Processing Time**

WAUSAU shall use its best efforts to ensure that each and every Claim processed hereunder is completely accurate in all respects, including without limitation, amount of Claim payment, compliance with the applicable Plan, and utilization and appropriate procedure codes pursuant to generally accepted national health claim coding standards and conventions (to include CPT-4, ICD-9CM, NDC, ADA, and any other or future generally recognized standard procedure codes or such other codes which the Plan Sponsor shall specifically require). WAUSAU shall process all Claims in accordance with the performance standards set forth below. If a Claim is made but WAUSAU has not received all necessary information, WAUSAU shall notify the claimant or provider, as appropriate, of such required additional information within ten (10) working days of its receipt of the initial Claim and shall notify the Plan Sponsor, if requested.

3.   **WAUSAU Audit**

WAUSAU will, as soon as practicable after the end of each calendar year under this Agreement, provide a report showing its performance for the preceding calendar year under the standards set forth in paragraph A. Performance Audit and Guarantee below. Such report will show the calculations for the amount of any credit assessable as the result of WAUSAU's failure to meet any performance standard.

It is understood and agreed that in the event credits are assessable either as a result of WAUSAU's report or a Plan Sponsor's audit as provided for in paragraph A. Performance Audit and Guarantee below, no such credits will exceed fifteen percent (15%) of the service fee paid to WAUSAU for the period covered by the report or audit during which WAUSAU failed to meet the performance standards. If a credit is due to Plan Sponsor as a result of WAUSAU's failure to meet performance standards, WAUSAU will deduct the amount of any such credit from future service fees payable to WAUSAU under this Agreement on a prorated basis over a period of time equal to the period of time covered by the report or audit.

**Performance Audit and Guarantee**

A.   The Plan Sponsor, upon advance written notice to WAUSAU, whether directly or through the appointment of a third party, shall be entitled to conduct, at its sole expense, a performance audit of WAUSAU's books, accounts and/or records relating to its performance of any and all services delivered pursuant to the Agreement to confirm the accuracy of such records. For purposes of this paragraph, the Plan Sponsor shall be entitled to conduct such audit procedures in conjunction with any other party who has a contract for the delivery of management services with NCHA (or such alternative common management consultant in a contract for the delivery of services from WAUSAU). If such joint audit is performed, such audit procedures and any credits which may be required to be provided pursuant to the Agreement of this Schedule shall be performed and/or provided on an aggregate basis with such other party. To commence such audit, the Plan Sponsor shall deliver a thirty (30) days advance written notice to WAUSAU, which informs WAUSAU that the audit is requested, the time period covered by the audit (not less than six (6) months, but not to exceed twelve (12) months), the audit sample size (not to exceed two and one-half percent (2.5%) of the relevant Claims.) and how the data is to be provided for the audit. Plan Sponsor reserves the right to limit such audit to medical plan Claims. Such audit may encompass

-1-

any relevant information that the Plan Sponsor requires, consistent with professional auditing practices and procedures applicable to this type of auditing as mutually agreed upon by WAUSAU, Plan Sponsor, and the Plan Sponsor's agent. The records requested by such auditor will be selected and compiled by WAUSAU in the manner requested by auditor, including, without limitation, computer selected random sampling or specific types of Claims selected through random selection or by stated dollar amount and/or range, provided that the audit must encompass a statistically valid random sampling of the Claims selected.

B. If the auditor asserts that it has made reasonably accurate predictive sampling consistent with reasonable professional standards in the field, WAUSAU hereby agrees that it shall provide to the Plan Sponsor a service fee credit (or if the Agreement has or will terminate prior to the Plan Sponsor's recovery of such credit, WAUSAU shall refund such amount to the Plan Sponsor) for each deviation from the performance guaranteed herein (as defined below). The parties agree to the following minimum performance requirements:

**i.   Financial**

Claim payments, on an aggregated dollar basis, shall be ninety-nine percent (99%) accurate to the accurately paid if the payment amount was determined in accordance with the instructions of the plan of benefits. If there is an ambiguity in the Plan, such Claim shall be considered as Plan Sponsor. Financial payment percentage accuracy will be calculated by dividing the total dollars mispaid during the audit period by the total dollars audited during the same period, subtracting the result from 1.00 and multiplying the result by one hundred (100).

In making this calculation, the absolute value of overpayments and under payments will be used to determine the total dollars mispaid.

If the financial payment accuracy falls below ninety-nine (99%), WAUSAU will give Plan Sponsor a credit of one-half percent (1/2%) of the claim administration fee for the period audited for each one-half percentage point below ninety-nine (99%), subject to a maximum credit of five percent (5%) of the claim administration fee for the period audited.

**ii.   Turnaround**

Ninety percent (90%) of all Claims shall be processed on or before the tenth (10th) working day from the date that WAUSAU has received all information necessary to adjudicate the Claim. Such information shall include the detailed provider bill, completed standard hospital bill (UB-92), professional and/or outpatient bills (HCFA-1500), and patient medical record information. Claims will be considered "processed" when WAUSAU has released the Claim for payment, denial, referral to outside review, or request for additional information.

WAUSAU's performance will be documented by claim turnaround reports that are claim system generated.

For each full one (1) day that the time to process ninety percent (90%) of all claims exceeds ten (10) working days, WAUSAU will give the Plan Sponsor a credit of one percent (1%) of the claim administration fee for the period audited, subject to a maximum credit of five percent (5%) of the claim administration fee for the period audited.

**iii.   Procedural**

Incidence accuracy will be maintained at a level of ninety-five percent (95%).

1.   Procedural Accuracy:  Procedural accuracy will be defined as adherence to the procedures outlined in Wausau's Claim Procedure Manual.

-2-

2. Coding Accuracy: Coding accuracy will be defined as correct coding of Current Procedural Terminology (CPT) procedure codes, International Classification of Diseases 9 (ICD9) disability codes, and coding requirements of Uniform Bill 93 (UB-93) hospital billing code.

The incidence accuracy percentage will be determined by dividing the number of claims containing procedural or coding errors noted in the audit by the number of claims in the audit sample, subtracting the result from 1.00, and multiplying the result by one hundred (100). For purposes of the incidence accuracy calculation, any claim containing multiple procedural and/or coding errors will be counted as one claim containing an error.

If the incidence accuracy falls below ninety-five (95%), WAUSAU will give the Plan Sponsor a credit of one-half percent (1/2%) of the claim administration fee for the period audited for each one percentage point below ninety-five (95%), subject to a maximum credit of five percent (5%) of the claim administration fee for the period audited.

iv. If the Plan Sponsor and/or any other party who has a contract for the delivery of services with WAUSAU and the same management consultant (initially NCHA) have accrued more than One Hundred Thousand Dollars ($100,000) of aggregated credit in any one (1) plan year, pursuant to this section iv. of this Schedule A, the Plan Sponsor shall be entitled to terminate the agreement pursuant to the provisions of subparagraph 2.4 of the Agreement.

C. At such time as any of the goal performance standards referenced above in this section are not achieved, the following actions shall be taken:

i. WAUSAU shall perform an internal audit of sufficient procedure and detail to appropriately identify probable explanations for its failure to achieve such performance goals.

ii. The parties shall meet to discuss in detail any problems which are preventing WAUSAU from achieving such performance goals and shall develop an appropriate action plan which is developed to cause WAUSAU to achieve such performance goal.

iii. WAUSAU shall implement such action plan and shall report to the Plan Sponsor, or its management consultant, on a monthly basis its actual performance level compared to the performance goal; if after (or during if appropriate) implementation of such action plan WAUSAU continues to fail to achieve such performance goal, the procedures set forth in this subparagraph C shall be repeated.

Nothing in this paragraph shall be deemed to or otherwise constitute a waiver of any other right of the Plan Sponsor or an election of remedies in any manner.

D. In the event that the operations of WAUSAU's facilities, or any substantial portion thereof, are interrupted by war, fire, insurrection, labor disputes, riots, earthquakes, acts of God, or, without limiting the foregoing, any other cause beyond the control of WAUSAU, the provisions of this Schedule A (or such portions hereof as WAUSAU is hereby rendered incapable of performing) may be suspended for the duration of such interruption. WAUSAU shall notify the Plan Sponsor of such suspension in writing, and shall include an identification of the necessary adjustments to any provision of this Schedule A.

4. **Personnel Requirements**

A. WAUSAU shall provide, train, and maintain such number of Claim Service Representatives ("CSR") as WAUSAU deems are necessary to provide all Claims processing services required to be performed pursuant to the Agreement and this Schedule A including, without limitation, process and adjudicate Claims and provide personal customer services to all of the Plan Sponsor's employees, retirees, and covered dependents ("Participants") within the time requirements of this Agreement and in accordance with applicable appropriate professional standards.

B.   CSRs shall be available for the delivery of services required pursuant to the Agreement and this Schedule A at least Monday through Friday of each calendar week (excluding holidays recognized by WAUSAU provided that WAUSAU has provided the Plan Sponsor with an annual list of its holidays for the next Plan Year) from the hours of 7:00 until 17:00 (Central Standard Time or Central Daylight Time, whichever is appropriate) via a toll-free telephone number.  WAUSAU shall maintain a telephone call abandon rate for incoming calls from participants of no more than 2% of the total calls received. WAUSAU shall take all reasonably required actions necessary to comply with the requirements of this paragraph and to assure that such delivered services are delivered in a professional manner.

5.   **Reports**

WAUSAU shall, at its sole expense, mail to Bowers & Associates Inc (or such other third party consultant designated by the Plan Sponsor) post marked not later than ten (10) working days after the end of each calendar quarter (March 31, June 30, September 30, and December 31) Claims information in a form reasonably requested by the Plan Sponsor that meets Bowers & Associates Inc or the Plan Sponsor's then current direct or indirect health care data analysis consultant's requirements.  Eligibility information will be mailed to Bowers & Associates Inc, or such other third party consultant designated by the Plan Sponsor, monthly.  The Plan Sponsor shall be entitled, in addition to any other right which it may have under the Agreement or this Schedule A, to withhold all fees currently owed if any such information is not transferred at the time required by this paragraph until such transfers have been completed in accordance with the requirements of this section.

6.   **Management and Other Reports**

WAUSAU shall prepare and deliver to the Plan Sponsor and NCHA (or such other designated management consultant), at its sole expense, standard management, financial, accounting, and such other reports, in the form and as otherwise reasonably requested by the Plan Sponsor within ten (10) working days after the expiration of the applicable defined period.  The form and substance of the initial set of required from shall be submitted to WAUSAU within ninety (90) days after the execution of the Agreement.  Additionally, WAUSAU shall deliver such reports in the medium which the Plan Sponsor shall reasonably require, including, without limitation, written copy, diskette or other machine readable format.  The Plan Sponsor shall be entitled to, in addition to any other right which it may have under the Agreement or this Schedule A, withhold one-half of all fees currently owed if any such report(s) is not transferred at the time required by this section until such transfer has been completed in accordance with the requirements of this section.

7.   **Integrated System**

WAUSAU shall provide the Plan Sponsor and NCHA with an integrated Claims administrative system to include the following:

1.   Document indexing, handling, archival and retrieval;

2.   Processing of medical, vision, and, if applicable, flexible spending Claims, and administration required for prescription drug and drug card programs;

3.   Medical services utilization review and case management edits;

4.   Correspondence and electronic mail;

5.   Financial transactions; and

6.   Other system services mutually agreed to between WAUSAU and the Plan Sponsor.

-4-

8. **Medical Management and Complex Claim Review Services**

WAUSAU shall at all times have available, at its sole expense, licensed physicians, registered nurses, and other specialty trained personnel to assist WAUSAU in managing the Plan Sponsor's complex Claims and other managed medical care services. Such personnel shall be appropriately trained regarding the specific type of medical problem involved in the applicable individual case. Additionally, WAUSAU shall provide its professional staff access to the most current medical management information and literature.

9. **Encode Discharge Status Information**

WAUSAU shall encode on all inpatient medical Claims the discharge status indicators specified by the Plan Sponsor. Such indicators shall include the standard discharge terminus elements of deaths, home, skilled nursing facility, other hospital, transfers, and readmissions.

10. **Administration of Managed Care Contracts**

For purposes of the Agreement and this Schedule A, WAUSAU shall administer all managed care Claims per the terms and conditions of any contract(s) executed, directly or indirectly, between the Plan Sponsor and any third party health care related provider. Such contract shall constitute part of the Plan Sponsor's Plan for purposes of the Agreement and this Schedule A. Notwithstanding this provision, WAUSAU shall have no obligation to administer any managed care contract if WAUSAU reasonably deems its administration to be technically impossible or the expense to administer such third party health care contract is more than 140% of WAUSAU's average expense to provide such services for all of its current business calculated on an average Claims basis. In such instance, WAUSAU will notify the Plan Sponsor of its inability to administer the contract. Additionally, WAUSAU shall specifically identify in writing to the Plan Sponsor those specific items, procedures, etc., which cause it to not be able to administer such third party health care contract pursuant to this Agreement.

11. **Eligibility**

WAUSAU shall electronically maintain the eligibility files and information for the Plan Sponsor. Such information shall include, without limitation, the following information for each individual current employee and retiree covered under the Plan, and if applicable, for each covered dependent:

1. Name;

2. Address;

3. Gender;

4. Marital status;

5. Work state;

6. Date of birth;

7. Social Security number;

8. Job classification;

9. Job status (e.g., part time, full time);

10. Date of hire (provided that the Plan Sponsor supplies WAUSAU with date of hire information for all current employees and retirees; and

11. Effective date.

-5-

12. **Automatic Tracking**

WAUSAU's enrollment system shall interface with the Claim payment system to automatically track and accumulate Claims data by location and other indicators as defined by the Plan Sponsor.

13. **Reasonable and Customary Analyses**

WAUSAU shall utilize the Health Insurance Association of America data, or such other data approved by the Plan Sponsor, on a zip code specific basis, to determine reasonable and customary fees for surgery, anesthesia, laboratory and/or medical service fees. WAUSAU agrees to provide a semiannual special report to the Plan Sponsor regarding selected CPT codes. The Plan Sponsor (or its designee) will provide WAUSAU with a list (not to exceed 150 codes) of its most frequently utilized CPT codes and the applicable zip codes. WAUSAU will provide a report of fees prior to usual and customary schedule updates and subsequent to usual and customary schedule updates for all codes listed by the Plan Sponsor.

14. **Material Preparation**

WAUSAU shall provide, at its sole expense, the initial and any updated copies of the Plan Sponsor's medical and dental benefit books, identification card, and summary plan descriptions, if requested by the Plan Sponsor.

15. **Services for U.S. Covered Persons**

WAUSAU shall provide claims administrative services for the Plan Sponsor's Covered Persons residing and/or receiving medical care in the continental United States. Provided, however, the Plan Sponsor shall be entitled to include foreign located Covered Persons if such Claims are administered completely within the United States and any payment is accomplished in United States Dollars. Additionally, WAUSAU's Group Sales Representative shall be available to assist the Plan Sponsor with on-site enrollments or health Plan communications programs anywhere in the continental United States.

This Schedule A, which is effective April 1, 2000, is hereby incorporated into the Administrative Services Agreement entered into between KOLBE & KOLBE MILLWORK CO INC and WAUSAU effective January 1, 2000.

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates indicated below.

EMPLOYERS INSURANCE OF WAUSAU
A Mutual Company

By _____

Title   Senior Vice President
        Wausau Benefits
Date    May 16, 2000

KOLBE & KOLBE MILLWORK CO INC

By _Michael Tomryeh_

Title _Vice President - Finance_

Date _2-23-00_

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
### KOLBE & KOLBE MILLWORK INC
7671-00-010140 - Health

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between KOLBE & KOLBE MILLWORK INC and "Wausau Benefits, Inc." as follows:

Effective January 1, 2005, Section 5.4 of the Agreement is hereby deleted and replaced with the following wording and Section 5.5 of the Agreement is hereby added as follows:

5.4     **Enrollment:** The Plan Sponsor agrees to furnish Wausau Benefits with such information as may be necessary or required by Wausau Benefits to maintain adequate eligibility of Plan Sponsor's Covered Persons. Such information must be provided by the Plan Sponsor in a timely manner that will allow Wausau Benefits to provide services in accordance with this Agreement.

The Plan Sponsor shall submit the following enrollment data to Wausau Benefits electronically via the FTP File Transfer with PGP Encryption method, or by using the Web Based File Exchange method, Internet or diskette:

a.     For each employee participating in the Plan at the inception of this Agreement, the Plan Sponsor will make an initial determination regarding whether such employee is eligible for Benefits under the terms of the Plan.

b.     For employees applying for coverage under the Plan after the inception of this Agreement, the Plan Sponsor will determine whether the employee is eligible for Benefits under the terms of the Plan and if the employee is a late enrollee.

c.     For all Covered Persons enrolled under the Plan, the Plan Sponsor shall make the following determinations, pursuant to the terms of the Plan:

- The effective date of coverage.
- The applicable class of coverage.
- The type of coverage such as single/family/employee plus one.
- The Plan(s) under which there is coverage.

d.     For all Covered Persons enrolled under the Plan, the Plan Sponsor shall inform Wausau Benefits of any changes in contact information, including but not limited to name, address, and phone number, within thirty (30) days of the Plan Sponsor being made aware of such change.

5.5     **Identification Cards.** Wausau Benefits will provide two standard ID cards (including replacement cards) for each employee who is covered under the Plan Sponsor's Plan. The Plan Sponsor may, at its option, order customized ID cards for employees. If the Plan Sponsor elects to provide customized ID cards, the Plan Sponsor agrees that it will be responsible for the additional cost of such ID cards.

Effective January 1, 2005, Section 6.7 of Agreement is hereby added as follows:

**Large Bill Review and Claim Discount Services:** Wausau Benefits contracts with provider networks, healthcare financial services organizations, and outside bill review organizations that contract or negotiate with providers to get discounts on Claims that are not in the primary network. In exchange for this service, Wausau Benefits will retain a percentage of savings as stated on the Fee Schedule. If no discount is obtained, there is no cost to the Plan Sponsor for this service.

Effective January 1, 2005, Section 6.8 of Agreement is hereby added as follows:

**Claim Reprocessing:** At times, the Plan Sponsor may want Wausau Benefits to reprocess certain Claims.   At the Plan Sponsor's request, Wausau Benefits will reprocess a reasonable number of Claims, unless such reprocessing will cause an undue business hardship to Wausau Benefits.  If the Claim is being reprocessed in connection with an inadvertent error made by Wausau Benefits, there will be no fee to the Plan Sponsor for such reprocessing.  In the event, however, that certain Claims need to be reprocessed as a result of retroactive benefit or eligibility changes that the Plan Sponsor made or in connection with other action by the Plan Sponsor, its employees or agents, then a claims reprocessing fee will be charged to the Plan Sponsor as stated on the Fee Schedule.  A claim reprocessing fee will also be charged to the Plan Sponsor if the Plan Sponsor contracts directly with a provider network and that provider network gives Wausau Benefits incorrect or late fee or other provider information.  ·

Effective January 1, 2005:

Any reference to the name Wausau Pharmacy Benefits in the Administrative Services Agreement is hereinafter known as Innoviant, Inc.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

| Wausau Benefits, Inc. | | KOLBE & KOLBE MILLWORK INC | |
|---|---|---|---|
| By | *(signature)* | By | *Michael Tomsyck* |
| | Signature | | Signature |
| Name | Jay Anliker | Name | *Michael Tomsyck* |
| | Print Name | | Print Name |
| Title | President and CEO | Title | *Vice President – Finance* |
| Date Signed | January 27, 2005 | Date Signed | *1-24-05* |

## ADDENDUM #1

### FLEXIBLE SPENDING ACCOUNT (FSA)
### 7670-03-010140

**Effective 01-01-2004:**

**Section 1 - Definitions**

1.A     "Health Care Spending Account (HCSA or HCA)". A Health FSA is a plan under which employees can be reimbursed, on a pre-tax basis, for qualified medical care expenses as defined in Code 213 and which are not covered by a health benefit plan, accident benefits or any other benefit plan or insurance.

1.B     "Dependent Care Spending Account (DCSA or DCA)". A Dependent Care FSA is a plan under which employees can be reimbursed, on a pre-tax basis, for qualified dependent care expenses provided to an individual that enable the plan participant and spouse to be gainfully employed, in accordance with Section 129 of the Internal Revenue Service Code.

**Section 2 - General Responsibilities of the Plan Sponsor**

2.A     **Enrollment Census:** The Plan Sponsor shall provide Wausau Benefits with necessary enrollment information on Covered Persons including the effective date of coverage, demographic information, dependent information, plan option(s), payment options, start and termination dates, and other information identified in the standard Wausau Benefits' enrollment process.

2.B     **Change in Status Obligation:** Plan Sponsor must notify Wausau Benefits as soon as reasonably possible but no later than thirty (30) calendar days following a change in the Covered Person's status.

**Section 3 - General Responsibilities of Wausau Benefits**

3.A     **FSA Claims Services:**

As part of the base FSA fee, Wausau Benefits shall provide the following:

- Verify the eligibility of the Covered Person when an FSA Claim is submitted.
- Supply Plan Sponsor with FSA Claim Forms and educational material identifies claim filing requirements.
- Review FSA Claim Form and supporting documentation provided by the Covered Person.
- Provide the Covered Person with the status of their FSA Claim by either: WEB access; issuing a Benefit check; or sending the Covered Person an Explanation of Benefits.
- Provide customer service to Covered Persons via phone and WEB access.
- Electronic Funds Transfer (EFT) is a system that allows Wausau Benefits to electronically deposit the Covered Person's FSA claim reimbursement into the person's checking or savings account, if elected by the Plan Sponsor. It is understood, however, that Wausau Benefits must be granted ACH debit authority for the Plan Sponsor's claim account.
- Automatic reimbursement loading for HCSA is a feature that allows Wausau Benefits to pay deductibles from the Covered Person's FSA account rather than filing a separate Claim, if elected by the Plan Sponsor.
- Provide claims run-out services for 90 days following the end of each Plan Year for Claims incurred during the Plan Year.

Wausau Benefits shall provide the following FSA Spending services at an additional cost to the Plan Sponsor, as stated in the attached Fee Schedule of this Agreement:

- Mail FSA statements to employee's homes rather than to the Plan Sponsor's office.

**3.B    Reports:**

As part of the base FSA fee, Wausau Benefits will provide the Plan Sponsor with the following reports:

- **Employer Forfeiture Report:**  This report displays current Annual Election, YTD Deposits, YTD Payments and Account Balance information for each employee.  This report is distributed to the Plan Sponsor on a quarterly basis.
- **Employee Statement:**  This report includes the following information:  Opening balance, total contributions year to date, benefits paid year to date, and closing balance.  This report is distributed to the Plan Sponsor on a quarterly basis.

**3.C    Overpayments:**

In the event payment is made to or on behalf of an ineligible Covered Person who was retroactively terminated, or in the event of an overpayment, Wausau Benefits shall make an attempt to recover overpayments.  Wausau Benefits will send at least two letters to the Covered Person requesting the funds back.  In the event that this effort does not result in a recovery, Wausau Benefits may, at the Plan Sponsor's request, either 1) offset any future Claims that the Covered Person may have in the same Plan Year, by the amount of the overpayment to the extent possible, if this procedure is detailed in the Plan Document and SPD; or 2) engage a recovery agency to pursue recovery of the overpayment.  The Plan Sponsor understands that the recovery agency will retain 28% of the recovered amount as its service fee.  Wausau Benefits shall have no further obligation with respect to any such overpayment, except as stated under the Indemnification section of this Agreement.

**3.D    Uncashed Checks:**  In the event that a Covered Person fails to cash an FSA check within 180 calendar days from the date of issue, Wausau Benefits shall have no obligation to reissue the check.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

Wausau Benefits, Inc.

KOLBE & KOLBE MILLWORK INC

| | | | | |
|---|---|---|---|---|
| By | _Signature_ | By | _Michael Tomsyck_ <br> Signature |
| Name | Jay Anliker <br> Print Name | Name | _Michael Tomsyck_ <br> Print Name |
| Title | President and CEO | Title | _Vice President - Finance_ |
| Date Signed | January 27, 2005 | Date Signed | _1-24-05_ |

**AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT**
KOLBE & KOLBE MILLWORK INC
7671-00-010140 – Health
7671-03-010140 – Flex

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between Kolbe & Kolbe Millwork Inc. and Wausau Benefits, Inc. as follows:

**Effective January 1, 2006, Section 3.4 of Agreement is hereby added as follows:**

**Medicare Secondary Payer Rules:** It is the responsibility of the Plan Sponsor to notify the Centers for Medicare and Medicaid Services (CMS) if the Plan Sponsor is considered to be a small employer under the Medicare Secondary Payer Rules (MSP). Such notification to CMS is needed to ensure that Medicare pays Claims primary to the Plan Sponsor's Plan when appropriate. It is understood that CMS is only permitted to pay Claims to providers, and can not reimburse health plans if Medicare was not properly notified that the Plan Sponsor is claiming an exemption under the MSP Rules as a small employer. Plan Sponsor understands that Wausau Benefits pays Claims for Medicare-eligible persons as either primary or secondary, based on the determination made by Medicare.

**Effective January 1, 2006, Section 4.4 of Agreement is hereby added as follows:**

**Stop Loss:** In the event that Plan Sponsor has obtained stop loss insurance coverage for funding Plan Benefits in excess of certain specified individual and aggregate limits, Wausau Benefits will use commercially reasonable efforts to identify, track and file all specific stop loss insurance Claims with the stop loss carrier, on behalf of the Plan Sponsor. The Plan Sponsor, however, is responsible for providing Wausau Benefits with a copy of the stop loss policy by the effective date of this Agreement or as soon thereafter as reasonably possible, if Wausau Benefits did not place the Plan Sponsor's stop loss coverage with the carrier.

Wausau Benefits agrees to notify the Plan Sponsor and the stop loss carrier of any potential Claims that exceed the stop loss policy's attachment point, based on preliminary diagnosis or dollar amount of Claims or claim estimates that meet or exceed applicable thresholds. It is understood, however, that Wausau Benefits shall not be required to process Claims for Benefits other than in the order that Claims are received, and no priority will be given to Claims merely because the stop loss year is coming to a close. In no event will Wausau Benefits be held liable for any Claims not covered by the stop loss carrier, except as stated in the Indemnification section of this Agreement. It is understood that Wausau Benefits cannot represent or warrant a carrier's stop loss coverage or any terms of a carrier's stop loss coverage.

In the event that Wausau Benefits places the Plan Sponsor's Stop Loss coverage, Wausau Benefits may receive commissions from the insurer from whom you purchase insurance. The commissions received by Wausau Benefits may differ depending upon the product and insurer. Wausau Benefits may receive additional compensation from the insurer based upon other factors, such as premium volume placed with a particular insurer or persistence rates. If the Plan Sponsor wants to know an estimate of the amount of commissions or other compensation received by Wausau Benefits from carriers relating to your group for any year, please contact your Account Manager. If such a request is initiated, Wausau Benefits will provide you with that information when the amounts become known. Since the compensation may relate to an entire book of business, the amount attributable to any single customer would by definition be an estimate. Unless Plan Sponsor requests an estimate, one will not otherwise be provided.

**Effective January 1, 2006, Section 6.9 of Agreement is hereby added as follows:**

**Overpayments: (Applies to Health plan).** In the event payment is made to or on behalf of an ineligible Covered Person who was retroactively terminated, or if an overpayment was made to a provider or Covered Person, Wausau Benefits shall make an attempt to recover any payment over one hundred dollars ($100) by sending an initial request letter to the provider and/or Covered Person requesting the funds back. This will be followed by a second letter and a phone call as needed. The second letter will explain that the matter may be referred to a recovery (collection) agency. In the event that there is no response to the second letter, Wausau Benefits will contact the Plan Sponsor to see if the Plan Sponsor wants the overpayment file sent to an outside recovery

agency. Based on the written direction of the Plan Sponsor, Wausau Benefits will either forward the overpayment file to an outside recovery agency, or Wausau Benefits will close the overpayment file and take no further action.

Overpayment files that are forwarded to an outside recovery agency will be worked for six (6) months in an attempt to recover the overpayment. If the recovery agency is unsuccessful at recovering the funds, it will contact Wausau Benefits to see if the Plan Sponsor wants to approve litigation through outside legal counsel. If the Plan Sponsor approves sending an overpayment file to the outside recovery agency and/or outside legal counsel, the Plan Sponsor will be responsible for paying the applicable commission of the outside recovery agency and/or outside legal counsel, unless the overpayment arises out of or is based upon Wausau Benefits' intentional, willful, reckless or negligent acts or omissions in the performance of its duties under this Agreement.

Other third party recovery efforts: Wausau Benefits also contracts with an outside auditing firm that audits credit balances from various hospitals. If the outside audit firm identifies that this Plan is owed a refund, the refund minus the auditing firms' commission, will be sent to the Plan Sponsor.

**Effective January 1, 2006, Section 10.7 of Agreement is hereby added as follows:**

Plan Sponsor acknowledges that Wausau Benefits is a member of a corporate group which includes companies involved in the following:

- Innoviant for the sale of pharmacy benefits management services;
- Avidyn Health for the sale of medical management services.
- BP, Inc. and Sheridan Re for the sale and risk underwriting of a stop loss policy for the purpose of insuring a portion of the funding risk assumed by Plan Sponsor under the Plan.

To the extent the Plan Sponsor chooses to purchase any of the above services from one of the listed companies, these companies will receive payment to compensate them for performing such services as stated on the Fee Schedule, elsewhere in this Agreement, or in the stop loss contract. Part of these fees may include administrative fees or other compensation for Wausau Benefits in connection with the provision of such services, or stop loss commissions. The Plan Sponsor is aware of such compensation and the relationship between Wausau Benefits and the above entities and so signifies its acceptance by its execution of this Agreement.

**Effective June 1, 2006, it is understood that Wausau Benefits, Inc., has changed its name to Fiserv Health Plan Administrators, Inc. For purposes of the Administrative Services Agreement, Fiserv Health Plan Administrators, Inc. may also be referred to as Fiserv Health.**

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

WAUSAU BENEFITS, INC.                    KOLBE & KOLBE MILLWORK INC

By _____              By _*Michael Tomyek*_
      Signature                                    Signature

Name    Jay Anliker                      Name   _Michael Tomsyck_
        Print Name                               Print Name

Title    President and CEO               Title   _Vice President - Finance_

Date                                     Date
Signed _____          Signed   _6-30-06_

agency. Based on the written direction of the Plan Sponsor, Wausau Benefits will either forward the overpayment file to an outside recovery agency, or Wausau Benefits will close the overpayment file and take no further action.

Overpayment files that are forwarded to an outside recovery agency will be worked for six (6) months in an attempt to recover the overpayment. If the recovery agency is unsuccessful at recovering the funds, it will contact Wausau Benefits to see if the Plan Sponsor wants to approve litigation through outside legal counsel. If the Plan Sponsor approves sending an overpayment file to the outside recovery agency and/or outside legal counsel, the Plan Sponsor will be responsible for paying the applicable commission of the outside recovery agency and/or outside legal counsel, unless the overpayment arises out of or is based upon Wausau Benefits' intentional, willful, reckless or negligent acts or omissions in the performance of its duties under this Agreement.

Other third party recovery efforts: Wausau Benefits also contracts with an outside auditing firm that audits credit balances from various hospitals. If the outside audit firm identifies that the Plan is owed a refund, the refund minus the auditing firms' commission, will be sent to the Plan Sponsor.

**Effective January 1, 2006, Section 10.7 of Agreement is hereby added as follows:**

Plan Sponsor acknowledges that Wausau Benefits is a member of a corporate group which includes companies involved in the following:

- Innoviant for the sale of pharmacy benefits management services;
- Avidyn Health for the sale of medical management services.
- BP, Inc. and Sheridan Re for the sale and risk underwriting of a stop loss policy for the purpose of insuring a portion of the funding risk assumed by Plan Sponsor under the Plan.

To the extent the Plan Sponsor chooses to purchase any of the above services from one of the listed companies, these companies will receive        t to compensate them for performing such services as stated on the Fee Schedule, elsewhere in this Agreement, or in the stop loss contract. Part of these fees may include administrative fees or other compensation for Wausau Benefits in connection with the provision of such services, or stop loss commissions. The Plan Sponsor is aware of such compensation and the relationship between Wausau Benefits and the above entities and so signifies its acceptance by its execution of this Agreement.

**Effective June 1, 2006, it is understood that Wausau Benefits, Inc., has changed its name to Fiserv Health Plan Administrators, Inc. For purposes of the Administrative Services Agreement, Fiserv Health Plan Administrators, Inc. may also be referred to as Fiserv Health.**

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

WAUSAU BENEFITS, INC.                    KOLBE & KOLBE MILLWORK INC

By _____              By _____
        Signature                              Signature

Name    Jay Anliker                      Name    Michael Tomsyck
        Print Name                               Print Name

Title   President and CEO                Title   Vice President - Finance

Date                                     Date
Signed  9/29/06                          Signed  6-30-06

### AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
#### KOLBE & KOLBE MILLWORK INC.
7671-00-010140 – Health
7671-03-010140 – Flex

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between Kolbe & Kolbe Millwork Inc. and Fiserv Health Plan Administrators, Inc., as follows:

**Effective January 1, 2007, Section 7.6 of Agreement regarding Subrogation is hereby added as follows:**

In the event that Plan Sponsor directs Fiserv Health to stop working on a particular subrogation Claim because the Plan Sponsor wants to handle the subrogation Claim itself or for other reasons not related to Fiserv Health's negligence, Fiserv Health retains the right to charge Plan Sponsor a reasonable fee for costs incurred prior to receiving such notification from Plan Sponsor.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

**FISERV HEALTH PLAN ADMINISTRATORS, INC.**      **KOLBE & KOLBE MILLWORK INC**

By _____          By _____
       Signature                                              Signature

Name    Jay Anliker                                   Name    Michael Tomsyck
        Print Name                                            Print Name

Title    Division President                            Title    Vice President – Finance

Date                                                   Date
Signed    8/23/07                                      Signed    8-14-07

AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
KOLBE & KOLBE MILLWORK INC.
7671-00-010140 – Health
7671-03-010140 – Flex

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between Kolbe & Kolbe Millwork Inc. and Fiserv Health Plan Administrators, Inc., as follows:

Effective January 1, 2008, Section 6.7 of Agreement is hereby deleted and replaced as follows:

Cost Reduction and Savings Program. Fiserv Health agrees to provide various cost reduction services on behalf of Plan Sponsor, aimed at generating savings on Claims. Services may include but are not limited to, obtaining discounts through travel networks, secondary networks, and fee negotiation with providers. In exchange for this service, Fiserv Health will retain a percentage of savings as stated on the Fee Schedule. If no discount is obtained, there is no cost to Plan Sponsor for this service.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

FISERV HEALTH PLAN ADMINISTRATORS, INC.        KOLBE & KOLBE MILLWORK INC

By _____                By _____
        Signature                                       Signature

Name    Jay Anliker                            Name    Michael Tomiyul
        Print Name                                     Print Name

Title    Division President                    Title    Vice President - Finance

Date                                           Date
Signed   4/8/08                                Signed   2-11-08

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT

**Effective January 1, 2008,** Section 4.5 is hereby added to the Agreement as follows:

4.5 **Medicare Reporting:** UMR agrees to provide the Centers for Medicare and Medicaid Services (CMS) with a quarterly eligibility file that contains social security numbers and other information on Covered Persons and the Plan Sponsor, as required by the Medicare Secondary Payer Mandatory Reporting Provisions in Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007. Plan Sponsor agrees to timely provide UMR with all reasonable data that UMR requests, and in an agreed upon format, to enable both parties to comply with the reporting requirements. UMR shall not be responsible for any noncompliance penalties in connection with the Medicare reporting requirements except as stated in the Indemnification provision of this Agreement.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

**UMR, Inc.**                                    **KOLBE & KOLBE MILLWORK INC**

By _____        By _____
         Signature                                             Signature

Name   Jay Anliker                          Name   Michael Tomsyck
         Print Name                                         Print Name

Title   President & CEO                    Title   Vice President ~ Finance

Date                                               Date
Signed  5/19/10                           Signed  5-7-10

## EXHIBIT A - FEE STRUCTURE
### Effective January 1, 2000

| ITEM | BASIS | FEE |
|------|-------|-----|
| **Base Fee** | | **REDACTED** |
| Medical | *PEPM for Year 2000 | |
| | *PEPM for Year 2001 | |
| | *PEPM for Year 2002 | |
| | *PEPM for Year 2003 | |
| Accident and Sickness | *PEPM for Year 2000 | |
| | *PEPM for Year 2001 | |
| | *PEPM for Year 2002 | |
| | *PEPM for Year 2003 | |
| **Pharmacy Services** | | |
| Claim Processing Fee | | |
| Dispensing Fee | Per Prescription | |
| Pharmacy Prior Authorization | Per Prescription | |
| **Network/Managed Care** | | |
| PHCS Healthy Directions (XA) | *PEPM | |
| Associates for Health Care (AC) | *PEPM | |
| (Effective April 1, 2000) | | |
| **Special Services** | | |
| Medical (M.D.) | Per Hour | |
| Actuarial Services | FSA Per Hour | |
| | ASA Per Hour | |
| | Actuarial Analyst | |
| Wausau Nurses (Not Including | | |
| Routine Consultation With CSR) | Per Hour | |
| Claim Consultants and Managers | Per Hour | |
| Systems Services for Special Reports | Per Hour | |
| NY Surcharge Claim Activity Reporting | Per Year | |

*PEPM - Per Employee (Active or Retired) Per Month

All rates subject to increase pursuant to Section 9.3 of the Agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates indicated below.

EMPLOYERS INSURANCE OF WAUSAU
A Mutual Company

By _____

Title   Senior Vice President
        Wausau Benefits
Date    May 16, 2000


KOLBE & KOLBE MILLWORK CO INC

By   *Michael Tomayck*

Title   *Vice President - Finance*

Date   *2-23-00*

## EXHIBIT A - FEE STRUCTURE
### Effective January 1, 2002

| ITEM | BASIS | FEE |
|---|---|---|
| **Base Fee** | | **REDACTED** |
| Medical | *PEPM for Year 2002 | |
| | *PEPM for Year 2003 | |
| | | |
| Accident and Sickness | *PEPM for Year 2002 | |
| | *PEPM for Year 2003 | |
| | | |
| **Pharmacy Services** | | |
| Pharmacy Benefit Management | | |
| | | |
| **Network/Managed Care** | | |
| PHCS Healthy Directions (XA) | *PEPM | |
| Associates for Health Care (AC) | *PEPM | |
| | | |
| **Special Services** | | |
| | | |
| Medical (M.D.) | Per Hour | |
| Actuarial Services | FSA Per Hour | |
| | ASA Per Hour | |
| | Actuarial Analyst | |
| Wausau Nurses (Not Including | Per Hour | |
| Routine Consultation With CSR) | | |
| Claim Consultants and Managers | Per Hour | |
| Systems Services for Special Reports | Per Hour | |
| NY Surcharge Claim Activity Reporting | Per Year | |

*PEPM - Per Employee (Active or Retired) Per Month

All rates subject to increase pursuant to Section 9.3 of the Agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates indicated below.

Wausau Benefits, Inc.

By _____

Print Name _Alfred Moore_____

Title _President and CEO_____

Date __May 14, 2002_____

KOLBE & KOLBE MILLWORK CO INC

By __Michael Tomsyck_____

Print Name __Michael Tomsyck___

Title __VP - Finance_____

Date __4-22-02_____

# EXHIBIT A

## FEE STRUCTURE

7671-00-010140

**Effective January 1, 2003**

| ITEM | BASIS | FEE |
|------|-------|-----|
| BASE FEE: | |  |
| Medical | * PEPM | |
| Accident and Sickness | * PEPM | |
| | | |
| OPTIONAL SERVICE FEES: | | |
| | | |
| **Pharmacy Services** | | |
| Pharmacy Benefit Management | | |
| Wausau Pharmacy Benefits Per Electronic Claim | | |
| Wausau Pharmacy Benefits – Paper Submitted | | |
| | | |
| **Network/Managed Care** | | |
| PHCS Healthy Directions | | |
| Associates for Health Care | * PEPM | |
| | | |
| Customer Specific OPI – Wausau Reprices Internally | | |
| | | |
| **ID Cards** | | |
| Custom ID Cards (i.e. Logo) | | |
| | | |
| **Claim Services** | | |
| Reinsurance Fee | * PEPM | |
| Subrogation Servicing (Internal Administration) | | |
| | | |
| Short Term Disability Management | | |
| | | |
| **Reporting/Special Data Options** | | |
| NY Surcharge Claim - Activity Reporting | Per Year | |
| | | |
| **Enrollment Options** | | |
| Eligibility to Non-Wausau Benefits vendor | | |

\*   PEPM – Per Employee Per Month

IN WITNESS WHEREOF, the parties have signed this EXHIBIT on the dates indicated below.

Wausau Benefits, Inc.                    KOLBE & KOLBE MILLWORK CO INC

By _____            By _____
      Signature                              Signature

      Alfred P. Moore,                        Michael  Tomsyck
      Print Name                              Print Name

Title   President & CEO                  Title   Vice President - Finance

Date    3/7/03                           Date    2-24-03

-11-

# EXHIBIT A

## FEE STRUCTURE

7671-00-010140 - Health

### Effective January 1, 2004 and January 1, 2005

This Fee Structure replaces the prior Fee Structures in the Administrative Services Agreement between KOLBE & KOLBE MILLWORK INC and WAUSAU BENEFITS, INC.

| ITEM | BASIS | FEE | FEE |
|---|---|---|---|
| **BASE FEE:** | | | |
| | | REDACTED | |
| Medical  (Benefit Plans 001 and 003) | * PEPM | | |
| Medical   (Benefit Plan 004) | * PEPM | | |
| Accident and Sickness | * PEPM | | |
| Flexible Spending | | | |
|     Health Care | * PEPM | | |
|     Dependent Care | * PEPM | | |
| Additional Base Fee (Flex) | Annual | | |
| **ADDITIONAL SERVICE FEES:** | | | |
| **Innoviant Pharmacy Services** | | | |
| Pharmacy Benefit Management | **Percent of rebates retained by Wausau Benefits | | |
| Per Electronic Claim | Per Claim | | |
| Per Paper Claim Fee | Per Claim | | |
| Retail Discount Off Average Wholesale Price (AWP) (Lesser of Usual and Customary Amount or AWP Discount) | Per Brand Claim<br>   • Chain Pharmacy<br>   • Independent Pharmacy<br><br>Per Generic Non-Mac Claim<br><br>Per Generic Mac Claim<br>   • Chain Pharmacy<br>   • Independent Pharmacy | | |
| Mail Order Discount Off Average Wholesale Price | Per Brand Claim<br>Per Generic Claim | | |
| Dispensing Fee | Per Claim<br>   • Retail Brand<br>   • Retail Generic<br>   • Mail Order Brand<br>   • Mail Order Generic | | |

| ITEM | BASIS | FEE | FEE |
|------|-------|-----|-----|
| Compound Dispensing Fee (Lesser of Usual and Customary Amount or fee) | Per Claim | REDACTED | |
| **Network/Managed Care** | | | |
| NCHA PPO | * PEPM | | |
| Associates for Health Care | * PEPM | | |
| Large Bill Review / Fee Negotiations | Per Hour | | |
| Customer Specific OPI -- Wausau Reprices Internally | Per Year | | |
| **Claim Services** | | | |
| Reinsurance Fee | * PEPM | | |
| Subrogation | Percent of Recoveries | | |
| Short Term Disability Management | * PEPM | | |
| Over the Counter Drugs (Health Care Only) | * PEPM | | |
| Mail Flex Statements to employee's home address | ***PEPAPM per statement | | |
| **Reporting/Special Data Options** | | | |
| NY Surcharge -- Activity Report | Annual | | |
| Ad-Hoc Reports (Custom) | Per Hour | | |
| Claim Reprocessing | Per Claim | | |
| **Miscellaneous** | | | |
| Physician and Nurse Consulting | Per Hour -- Physician | | |
| | Per Hour -- Nurse | | |
| Actuarial Consulting | Per Hour | | |

\*   PEPM – Per Employee Per Month
\*\*   Any rebates on the cost of prescription drugs that are earned as a result of drug charges attributable to Plan Sponsor's Participants will be returned by Wausau Benefits to Plan Sponsor, except for the percentage retained by Wausau Benefits, if any, as stated above for Pharmacy Benefit Management services
\*\*\*   PEPAPM – Per Employee Per Account Per Month

IN WITNESS WHEREOF, the parties have signed this EXHIBIT on the dates indicated below.

Wausau Benefits, Inc.                    KOLBE & KOLBE MILLWORK CO INC

By _____              By _____
   Signature                               Signature

   Jay Anliker                             Michael  Tomsyck
   Print Name                              Print Name

Title   President & CEO                  Title   Vice President- Finance

Date   January 27, 2005                  Date   1-24-05

# EXHIBIT A

## FEE STRUCTURE (REVISION TO RENEWAL)

**7671-00-010140 – Health**
**7670-03-010140 – Flex**

**Effective January 1, 2006**

This Fee Structure replaces the prior Fee Structures in the Administrative Services Agreement between
KOLBE & KOLBE MILLWORK INC and WAUSAU BENEFITS, INC.

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | REDACTED |
| | Medical (BP 001 and 003) | * PEPM | |
| | Accident and Sickness | * PEPM | |
| | Flexible Spending | | |
| |    Health Care | * PEPM | |
| |    Dependent Care | * PEPM | |
| | **ADDITIONAL SERVICE FEES** | | |
| | **Enrollment Services** | | |
| 0209 | Electronic eligibility sent to Pharmacy Vendor | One-time setup fee Per Account Change | |
| | **ID Card Services** | | |
| 0201 | Custom ID Cards | Set up per New ID Card | |
| | **Network/Managed Care** | | |
| 1406 | Network Access Fees | | |
| |   HealthEOS w/PHCS Healthy Directions Travel Network | * PEPM | |
| |   Private Healthcare Systems PPO/NPPN Overlay | * PEPM | |
| |   Private Healthcare Systems Healthy Directions (Plan Sponsor holds direct contract with Ministry Network and Aspirus Network) | Percent of Savings | |
| 1408 | Large Bill Review / Fee Negotiations | Percent of Savings | |
| 0199 | Bill Review | Per Hour | |
| 0606 | Customer Specific OPI – Wausau Benefits Reprices Internally | Per Year | |
| | **Claim Services** | | |
| 0136 | Reinsurance Fee | * PEPM | |
| 0105 | Subrogation Services | Percent of Recoveries | |
| 0116 | Accum loads from a vendor (for Flex from RX vendor for auto-reimbursement) | One-time setup fee | |
| | Accum loads from a vendor (claim feed from RX vendor to apply Medical Lifetime Maximum) | One-time setup fee | |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 0727 | Short Term Disability Clinical Management | * PEPM | REDACTED |
| 0163 | Over the Counter Drugs (Health Care Only) | * PEPM | |
| 0100 | Mail Flex Statements to employee's home address | **PEPAPM per statement | |
| 0914 | Additional Base Fee (Medical) (Benefit Plan 008) | * PEPM | |
| | Additional Base Fee (Flex) | Annual | |
| | **Reporting/Special Data Services** | | |
| 1204 | NY Surcharge – Activity Report | Annual | |
| 0417 | Ad-Hoc Reports (Custom) | Per Hour | |
| 0140 | Claim Reprocessing | Per Claim | |
| | **Miscellaneous** | | |
| 0799 | Physician and Nurse Consulting | Per Hour – Physician | |
| | | Per Hour – Nurse | |
| 1399 | Actuarial Consulting | Per Hour | |

* PEPM – Per Employee Per Month
** PEPAPM – Per Employee Per Account Per Month

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

WAUSAU BENEFITS, INC.                    KOLBE & KOLBE MILLWORK INC

By _____              By _Michael Tomsyck_____
   Signature                                Signature

Name _Jay Anliker_____                Name _Michael Tomsyck_____
     Print Name                              Print Name

Title _President and CEO_               Title _Vice President - Finance_

Date                                    Date
Signed _____          Signed _6-30-06_____

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | | | **REDACTED** |
| 0727 | Short Term Disability Clinical Management | * PEPM | |
| 0163 | Over the Counter Drugs (Health Care Only) | * PEPM | |
| 0100 | Mail Flex Statements to employee's home address | **PEPAPM per statement | |
| 0914 | Additional Base Fee (Medical) (Benefit Plan 008) | * PEPM | |
| | Additional Base Fee (Flex) | Annual | |
| | **Reporting/Special Data Services** | | |
| 1204 | NY Surcharge – Activity Report | Annual | |
| 0417 | Ad-Hoc Reports (Custom) | Per Hour | |
| 0140 | Claim Reprocessing | Per Claim | |
| | **Miscellaneous** | | |
| 0799 | Physician and Nurse Consulting | Per Hour – Physician | |
| | | Per Hour – Nurse | |
| 1399 | Actuarial Consulting | Per Hour | |

    *  PEPM – Per Employee Per Month
    ** PEPAPM – Per Employee Per Account Per Month

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

| WAUSAU BENEFITS, INC. | | KOLBE & KOLBE MILLWORK INC | |
|---|---|---|---|
| By | _(signature)_ | By | _Michael Tomsyck_ |
| | Signature | | Signature |
| Name | Jay Anliker | Name | _Michael Tomsyck_ |
| | Print Name | | Print Name |
| Title | President and CEO | Title | _Vice President - Finance_ |
| Date Signed | 9/29/06 | Date Signed | 6-30-06 |

**AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT**
KOLBE & KOLBE MILLWORK INC
7671-00-010140 – Health
7671-03-010140 – Flex

Effective January 1, 2006, the Administrative Services Agreement between Wausau Benefits, Inc., and Kolbe & Kolbe Millwork Inc. is hereby amended to reduce the following fees due to a change in enrollment per the NCHA contract:

The Base Flexible Spending Account fee is reduced to REDACTED Per Employee Per Account Per Month.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

WAUSAU BENEFITS, INC.                    KOLBE & KOLBE MILLWORK INC.

By _____            By  _Michael Tomsyck_____
        Signature                                Signature

Name    Jay Anliker                      Name    _Michael Tomsyck_____
        Print Name                               Print Name

Title   President and CEO                Title   _Vice President - Finance_

Date                                     Date
Signed _____         Signed  _6-30-06_____

**AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT**
**KOLBE & KOLBE MILLWORK INC**
7871-00-010140 – Health
7871-03-010140 – Flex

Effective January 1, 2006, the Administrative Services Agreement between Wausau Benefits, Inc., and Kolbe & Kolbe Millwork Inc. is hereby amended to reduce the following fees due to a change in enrollment per the NCHA contract:

The Base Flexible Spending Account fee is reduced to ▆▆▆ Per Employee Per Account Per Month.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

| WAUSAU BENEFITS, INC. | | KOLBE & KOLBE MILLWORK INC. | |
|---|---|---|---|
| By | *[signature]* | By | *Michael Tomsyck* |
| | Signature | | Signature |
| Name | Jay Anliker | Name | *Michael Tomsyck* |
| | Print Name | | Print Name |
| Title | President and CEO | Title | *Vice President – Finance* |
| Date Signed | *9/29/06* | Date Signed | *6-30-06* |

# EXHIBIT A

## FEE STRUCTURE (RENEWAL)

**7671-00-010140 – Health**
**7670-03-010140 – Flex**

**Effective January 1, 2007**

This Fee Structure replaces the prior Fee Structures in the Administrative Services Agreement between KOLBE & KOLBE MILLWORK INC and FISERV HEALTH PLAN ADMINISTRATORS, INC.

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | |
| | Medical  (BP 002, 005, 006 & 007) | * PEPM | REDACTED |
| | Short-Term Disability | * PEPM | |
| | Flexible Spending | | |
| |    Health Care | * PEPM | |
| |    Dependent Care | * PEPM | |
| | **ADDITIONAL SERVICE FEES** | | |
| | **Enrollment Services** | | |
| 0209 | Electronic eligibility sent to Pharmacy Vendor | Per Account Change | |
| | **ID Card Services** | | |
| 0201 | Custom ID Cards | Set up per New ID Card | |
| | **Network/Managed Care** | | |
| 1406 | Network Access Fees | | |
| |    HealthEOS | * PEPM | |
| |    Private Healthcare Systems PPO/Multiplan Overlay/TRPN/TC3 | * PEPM | |
| |    (Plan Sponsor holds direct contract with Ministry Network and Aspirus Network) | Percent of Savings | |
| 1408 | Large Bill Review / Fee Negotiations | Percent of Savings | |
| 0199 | Bill Review | Per Hour | |
| 0606 | Customer Specific OPI – Fiserv Health Reprices Internally | Per Year | |
| | **Claim Services** | | |
| 0136 | Stop Loss Interface Fee | * PEPM | |
| 0105 | Subrogation Services | Percent of Recoveries | |
| 0116 | Accum loads from a vendor (for Flex from RX vendor for auto-reimbursement) | One-time setup fee | |
| | Accum loads from a vendor (claim feed from RX vendor to apply Medical Lifetime Maximum) | One-time setup fee | |
| 0727 | Short Term Disability Clinical Management | * PEPM | |
| 0163 | Over the Counter Drugs (Health Care Only) | * PEPM | |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 0100 | Mail Flex Statements to employee's home address (3rd quarter only) | **PEPAPM per statement | REDACTED |
| 0914 | Additional Base Fee (Medical) (Benefit Plan 008) | * PEPM | |
| | Additional Base Fee (Flex) | Annual | |
| | **Reporting/Special Data Services** | | |
| 1204 | NY Surcharge – Activity Report | Annual | |
| 0417 | Ad-Hoc Reports (Custom) | Per Hour | |
| 0140 | Claim Reprocessing | Per Claim | |
| | **Miscellaneous** | | |
| 0799 | Physician and Nurse Consulting | Per Hour – Physician | |
| | | Per Hour – Nurse | |
| 1399 | Actuarial Consulting | Per Hour | |

* PEPM – Per Employee Per Month
** PEPAPM – Per Employee Per Account Per Month

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

FISERV HEALTH PLAN ADMINISTRATORS, INC.

By _____
   Signature

Name   Jay Anliker
       Print Name

Title   Division President

Date
Signed   8/23/07

KOLBE & KOLBE MILLWORK INC

By   Michael Tomsyck
     Signature

Name   Michael Tomsyck
       Print Name

Title   Vice President – Finance

Date
Signed   8-14-07

# EXHIBIT A

## FEE STRUCTURE (RENEWAL)

**7671-00-010140 -- Health**
**7670-03-010140 -- Flex**

**Effective January 1, 2008**

This Fee Structure replaces the prior Fee Structures in the Administrative Services Agreement between
KOLBE & KOLBE MILLWORK INC and FISERV HEALTH PLAN ADMINISTRATORS, INC.

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | |
| | Medical  (BP 002, 005, 006 & 007) | * PEPM | **REDACTED** |
| | Short-Term Disability | * PEPM | |
| | Flexible Spending | | |
| |     Health Care | * PEPM | |
| |     Dependent Care | * PEPM | |
| | **ADDITIONAL SERVICE FEES** | | |
| | **Enrollment Services** | | |
| 0209 | Electronic eligibility sent to Pharmacy Vendor | Per Account Change | |
| | **ID Card Services** | | |
| 0201 | Custom ID Cards | Set up per New ID Card | |
| | **Network/Managed Care** | | |
| 1406 | Network Access Fees | | |
| |     HealthEOS | * PEPM | |
| |     Private Healthcare Systems PPO | * PEPM | |
| |     Ministry Network and Aspirus Network | | |
| 9938 | Cost Reduction & Savings Program (CRS) | Percent of Savings | |
| 0199 | Bill Review | Per Hour | |
| 0606 | Customer Specific OPI -- Fiserv Health Reprices Internally | Per Year | |
| | **Claim Services** | | |
| 0136 | Stop Loss Interface Fee | * PEPM | |
| 0105 | Subrogation Services | Percent of Recoveries | |
| 0727 | Short Term Disability Clinical Management | * PEPM | |
| 0163 | Over the Counter Drugs (Health Care Only) | * PEPM | |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 0100 | Mail Flex Statements to employee's home address (3rd quarter only) | **PEPAPM | |
| 0914 | Additional Base Fee (Medical) (Benefit Plan 008) Additional Base Fee (Flex) | * PEPM Annual | |
| | **Reporting/Special Data Services** | | |
| 1204 | NY Surcharge – Activity Report | Annual | |
| 0417 | Ad-Hoc Reports (Custom) | Per Hour | |
| 0140 | Claim Reprocessing | Per Claim | |
| | **Miscellaneous** | | |
| 0799 | Physician and Nurse Consulting | Per Hour – Physician Per Hour – Nurse | |
| 1399 | Actuarial Consulting | Per Hour | |



* PEPM – Per Employee Per Month
** PEPAPM – Per Employee Per Account Per Month

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

FISERV HEALTH PLAN ADMINISTRATORS, INC.      KOLBE & KOLBE MILLWORK INC

By _____         By _____
        Signature                                  Signature

Name    Jay Anliker                        Name    Michael Tomsyck
        Print Name                                 Print Name

Title   Division President                 Title   Vice President – Finance

Date                                       Date
Signed  4/18/08                            Signed  2-11-08

**AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT**
**Kolbe & Kolbe Millwork Inc.**

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between Kolbe & Kolbe Millwork Inc. and Fiserv Health Plan Administrators, Inc., as follows:

**Effective January 1, 2009,** it is understood that Fiserv Health Plan Administrators, Inc., is now known as UMR, Inc. ("UMR").

# EXHIBIT A

## FEE STRUCTURE (RENEWAL)

**7671-00-010140 – Medical**
**7670-03-010140 – Flex**

**Effective January 1, 2009**

This Fee Structure replaces the prior Fee Structures in the Administrative Services Agreement between KOLBE & KOLBE MILLWORK INC and UMR, Inc.

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | |
| | Medical  (BP 002, 005, 006 & 007) | * PEPM | |
| | Short-Term Disability | * PEPM | |
| | Flexible Spending | ** PEPAPM | |
| 0914 | Additional Base Fee (Medical) (Benefit Plan 008) | * PEPM | |
| | Additional Base Fee (Flex) | Annual | |
| | **ADDITIONAL SERVICE FEES** | | |
| | **Enrollment Services** | | |
| 0209 | Electronic eligibility sent to Pharmacy Vendor | Per Account Change | |
| | **ID Card Services** | | |
| 0201 | Custom ID Cards | Set up per New ID Card | |
| | **Network/Managed Care** | | |
| 1406 | Network Access Fees | | |
| |    HealthEOS | * PEPM | |
| |    Private Healthcare Systems PPO | * PEPM | |
| |    NCHA w/Marshfield Ministry Network and | | |
| |    NCHA Community Health Plan | | |
| 9938 | Cost Reduction & Savings Program (CRS) | Percent of Savings | |
| 0199 | Bill Review | Per Hour | |
| 0606 | Customer Specific OPI -- UMR Reprices Internally | Per Year | |
| | **Claim Services** | | |
| 0136 | Stop Loss Interface Fee | * PEPM | |

**REDACTED**

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 0105 | Subrogation Services | Percent of Recoveries |  |
| 0727 | Short Term Disability Clinical Management | * PEPM | |
| 0155 | Flex Spending Enrollment – EFT Banking | | |
| 0156 | Flex Spending Enrollment – Automatic Reimbursement | | |
| 0163 | Over the Counter Drugs | * PEPM | |
| 0165 | Check Cut and Full Tax Service | | |
| 0100 | Mail Flex Statements to employee's home address (3rd quarter only) | **PEPAPM | |

### Reporting/Special Data Services

| | | | |
|---|---|---|---|
| 1204 | NY Surcharge – Claim Activity Reporting | Annual | |
| 0402 | Development of Production Custom Reports | | |
| 0417 | Ad-Hoc Reports (Custom) | Per Hour | |
| 0140 | Claim Reprocessing | Per Claim | |

### Miscellaneous

| | | | |
|---|---|---|---|
| 0799 | Physician and Nurse Consulting | Per Hour – Physician / Per Hour – Nurse | |
| 1399 | Actuarial Consulting | Per Hour | |

\*   PEPM – Per Employee Per Month
\*\*   PEPAPM – Per Employee Per Account Per Month

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

**UMR, Inc.**                                        **KOLBE & KOLBE MILLWORK INC**

By _____          By _____
     Signature                                              Signature

Name   Jay Anliker _____          Name _____
     Print Name                                          Print Name

Title   President & CEO _____          Title _____

Date
Signed _____          Date
                                                     Signed _____

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
### Kolbe & Kolbe Millwork Inc.
7671-00-010140 – Medical
7670-03-010140 – Flex

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between Kolbe & Kolbe Millwork Inc. and UMR, Inc., as follows:

**Effective January 1, 2010,** Exhibit A of the Agreement (Fee Structure) is hereby updated as follows, and replaces all previous Fee Structures in the Agreement.

# EXHIBIT A

## FEE STRUCTURE (RENEWAL)

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | REDACTED |
| | Medical (BP 002, 005, 006 & 007) | * PEPM | |
| | Short-Term Disability | * PEPM | |
| | Flexible Spending | ** PEPAPM | |
| 0914 | Additional Base Fee (Medical) (Benefit Plan 008) | * PEPM | |
| | Additional Base Fee (Flex) | Annual | |
| | **ADDITIONAL SERVICE FEES** | | |
| 0209 | **Enrollment Services**<br>Electronic eligibility sent to Pharmacy Vendor<br>(Applies to BP 002, 005, 006, 007) | Per Account Change | |
| 0201 | **ID Card Services**<br>Custom ID Cards<br>(Applies to BP 002, 005, 006, 007) | Set up Charge per Custom ID Card | |
| 1406 | **Network/Managed Care**<br>Network Access Fees<br>HealthEOS | * PEPM | |
| | Private Healthcare Systems PPO | * PEPM | |
| | NCHA w/Marshfield Ministry Network and NCHA Community Health Plan | | |
| 9938 | Cost Reduction & Savings Program (CRS) | Percent of Savings | |
| 0199 | Bill Review (Applies to BP 002, 005, 006, 007) | Per Hour | |
| 0606 | Customer Specific OPI – UMR Reprices Internally (Applies to BP 005, 006) | Per Year | |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **Claim Services** | | REDACTED |
| 0136 | Stop Loss Interface Fee (Applies to BP 002, 005, 006, 007) | * PEPM | |
| 0105 | Subrogation Services (Applies to BP 002, 005, 006, 007) | Percent of Recoveries | |
| 0727 | Short Term Disability Clinical Management | | |
| 0155 | Flex Spending Enrollment – EFT Banking | | |
| 0156 | Flex Spending Enrollment – Automatic Reimbursement | | |
| 0165 | Check Cut and Full Tax Service | | |
| 0100 | Mail Flex Statements to employee's home address (3rd quarter only) | **PEPAPM | |
| | **Booklet/SPD Services** | | |
| 0922 | SPD Booklet Printing, if requested | | |
| | **Reporting/Special Data Services** | | |
| 0402 | Development of Production Custom Reports | Per Hour | |
| 0417 | Ad-Hoc Reports (Custom) (Applies to BP 002, 005, 006, 007) | Per Hour | |
| 0140 | Claim Reprocessing (Applies to BP 002, 005, 006, 007) | Per Claim | |
| | **Miscellaneous** | | |
| 0799 | Physician and Nurse Consulting (Applies to BP 002, 005, 006, 007) | Per Hour – Physician Per Hour – Nurse | |
| 1399 | Actuarial Consulting (Applies to BP 002, 005, 006, 007) | Per Hour | |

\*   PEPM – Per Employee Per Month
\*\*   PEPAPM – Per Employee Per Account Per Month

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT

**Effective January 1, 2009,** Section 4.5 is hereby added to the Agreement as follows:

    **4.5**    **Medicare Reporting:**  UMR agrees to provide the Centers for Medicare and Medicaid Services (CMS) with a quarterly eligibility file that contains social security numbers and other information on Covered Persons and the Plan Sponsor, as required by the Medicare Secondary Payer Mandatory Reporting Provisions in Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007.  Plan Sponsor agrees to timely provide UMR with all reasonable data that UMR requests, and in an agreed upon format, to enable both parties to comply with the reporting requirements.  UMR shall not be responsible for any noncompliance penalties in connection with the Medicare reporting requirements except as stated in the Indemnification provision of this Agreement.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated above.

**UMR, Inc.**

By     _(signature)_
          Signature

Name    Jay Anliker
          Print Name

Title     President & CEO

Date
Signed   _5/09/10_

**KOLBE & KOLBE MILLWORK INC**

By     _Michael Tomsyck_
          Signature

Name    _Michael Tomsyck_
          Print Name

Title     _Vice President – FINANCE_

Date
Signed   _5-7-10_

**AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT**
**Kolbe & Kolbe Millwork Inc.**
7671-00-010140 – Medical
7670-03-010140 -- Flex

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between Kolbe & Kolbe Millwork Inc. and UMR, Inc., as follows:

**Effective January 1, 2011,** Exhibit A of the Agreement (Fee Structure) is hereby updated as follows, and replaces all previous Fee Structures in the Agreement.

# EXHIBIT A

## FEE STRUCTURE (RENEWAL)

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | |
| 0001 | Medical  (BP 002, 005, 006 & 007) | *  PEPM | **REDACTED** |
| 0914 | Additional Base Fee (Medical) (BP 008) | *  PEPM | |
| 0001 | Short-Term Disability | *  PEPM | |
| 0001 | Base Flexible Spending Fee | ** PEPAPM | |
| 0914 | Additional Base Flexible Spending Fee | Annual | |
| | **ADDITIONAL SERVICE FEES** | | |
| | **Enrollment Services** | | |
| 0209 | Electronic eligibility sent to Pharmacy Vendor (Applies to BP 002, 005, 006, 007) | Per Account Change | |
| | **ID Card Services** | | |
| 0201 | Custom ID Cards (Applies to BP 002, 005, 006, 007) | Set up Charge per Custom ID Card | |
| | **Network/Managed Care** | | |
| 1406 | Network Access Fees | | |
| | HealthEOS | *  PEPM | |
| | Private Healthcare Systems PPO | *  PEPM | |
| | NCHA w/Marshfield Ministry Network and NCHA Community Health Plan | | |
| 9938 | Cost Reduction & Savings Program (CRS) | Percent of Savings | |
| 0199 | Bill Review (Applies to BP 002, 005, 006, 007) | Per Hour | |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 0606 | Customer Specific OPI – UMR Reprices Internally  (Applies to BP 005, 006) | Per Year | REDACTED |
| | **Claim Services** | | |
| 0136 | Stop Loss Interface Fee (Applies to BP 002, 005, 006, 007) | * PEPM | |
| 0105 | Subrogation Services (Applies to BP 002, 005, 006, 007) | Percent of Recoveries | |
| 0727 | Short Term Disability Clinical Management | | |
| 0155 | Flex Spending Enrollment – EFT Banking | | |
| 0156 | Flex Spending Enrollment – Automatic Reimbursement | | |
| 0165 | Check Cut and Full Tax Service | | |
| 0100 | Mail Flex Statements to employee's home address (3rd quarter only) | **PEPAPM | |
| | **Booklet/SPD Services** | | |
| 0922 | SPD Booklet Printing, if requested | | |
| | **Reporting/Special Data Services** | | |
| 0402 | Development of Production Custom Reports | Per Hour | |
| 0417 | Ad-Hoc Reports (Custom) (Applies to BP 002, 005, 006, 007) | Per Hour | |
| 0140 | Claim Reprocessing (Applies to BP 002, 005, 006, 007) | Per Claim | |
| | **Miscellaneous** | | |
| 0799 | Physician and Nurse Consulting (Applies to BP 002, 005, 006, 007) | Per Hour – Physician Per Hour – Nurse | |
| 1399 | Actuarial Consulting (Applies to BP 002, 005, 006, 007) | Per Hour | |

\* PEPM – Per Employee Per Month
\*\* PEPAPM – Per Employee Per Account Per Month

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated on the above pages.

| UMR, Inc. | | KOLBE & KOLBE MILLWORK INC | |
|---|---|---|---|
| By | *[signature]* | By | *[signature]* Michael Tomeyer |
| | Signature | | Signature |
| Name | Jay Anliker | Name | Michael Tomsyck |
| | Print Name | | Print Name |
| Title | President & CEO | Title | VP-FINANCE |
| Date Signed | 5/12/11 | Date Signed | 5-2-11 |



### PHYSICIAN AGREEMENT

This Agreement is by and between MEDICAL COLLEGE OF WISCONSIN, ("Physician") and NORTH CENTRAL HEALTH CARE ALLIANCE, INC. ("NCHA") a corporation organized in the State of Wisconsin. In consideration for their mutual warranties and agreements as set forth herein, the parties hereto agree as follows:

### RECITALS

Whereas, NCHA has entered or intends to enter contracts with Entities (hereafter defined), who will make payment for certain health care expenditures incurred by their employees, dependents and other designated individuals eligible to have their health care paid for by such Entities, to arrange for the provision of certain health care services; and,

Whereas, Physician is desirous of contracting with NCHA to provide services for those whose benefit NCHA contracts, on and subject to the terms and conditions hereof; and,

Whereas, NCHA is desirous of offering the services of Physician to Beneficiaries (as hereafter defined) of Entities (also as hereafter defined) on and subject to the terms and conditions hereof.

Now, therefore, for a good and valuable consideration, Physician and NCHA agree as follows:

I.  Definitions

As used herein the following terms have the indicated meanings:

(A)   "Actual Charges" shall mean the charges which Physician normally bills for the indicated medical service.

(B)   "Allowable Charges" shall mean the fees set forth on Exhibit A for Covered Services.

(C)   "Beneficiary" or "Beneficiaries" shall mean any employee, retiree or any of their respective dependents or any other persons participating under a Plan of an Entity and who are eligible to have their medical services paid for under the terms of a Plan of an Entity (the term includes those eligible under COBRA).

(D)   "Covered Services" shall mean those medical services covered under a Plan, subject to any limitations on such coverage as may be contained in such Plan.

(E)   "Entity" shall mean any employer, including any corporation, organization, partnership, proprietorship, governmental unit, or other legal body with whom NCHA has contracted or may hereafter contract and which has an obligation to pay for Covered Services or provide benefits for Covered Services provided to a Beneficiary, which Covered Services are provided under the terms of this Agreement, provided that NCHA has furnished (and not withdrawn) a written notice to Physician that such employer is an Entity hereunder. The Entities receiving NCHA services as of the effective date of this agreement are listed on Exhibit B.

(F)   "Entity Agreement" shall mean a contract between an Entity and NCHA pursuant to which an Entity acknowledges and agrees to be an Entity hereunder and to make



EXHIBIT

B

payment to Physician for medical care (including Covered Services) rendered pursuant to the terms of this Agreement to its Beneficiaries.

(G)  "Plan" shall mean Entity's self-insured Medical Benefit Plan, as its terms may be modified from time to time and Entity workers compensation insurance policy, disability program and/or any other contract or arrangement pursuant to which Entity is obligated to make payment for health care services, including Covered Services, for such Beneficiaries.

## II.   Agreements of Physician

Physician agrees that at all times will:

(A)  Provide Covered Services to Beneficiaries for the Allowable Charges listed on Exhibit A.

(B)  Accept the Allowable Charges, determined on the basis of the principal diagnosis or procedure, as payment in full for Covered Services provided to Beneficiaries and not bill any Beneficiary for any amount (except for copayments, coinsurance and deductibles which shall be deducted from the Allowable Charges set forth in Exhibit A). Physician is responsible for billing and collecting all copayments, coinsurance and deductibles.

(C)  Provide Covered Services to Beneficiaries in the same manner and of the same quality and efficiency that Physician provides such services to other patients of Physician.

(D)  Maintain all approvals, certificates, unrestricted licenses, certification as a Medicare and Medicaid provider and consents necessary to operate its business and perform Covered Services.

(E)  Participate in any reasonable grievance procedure established by NCHA (or an Entity for its Beneficiaries) which provides a fair procedure for Beneficiary complaints provided that such procedure shall not require Physician to settle any professional liability claim or lawsuit.

(F)  Maintain, for Physician and employed professionals providing or authorized to provide Covered Services hereunder, professional liability (malpractice) insurance as mandated by the State of Wisconsin.

(G)  Comply with all applicable laws and/or regulations (including confidentiality laws) in the delivery of medical and/or related services to Beneficiaries.

(H)  Cause its staff providing Covered Services hold all licenses, approvals and certifications required by the State of Wisconsin and any governmental agency or body to perform such services.

(I)  Provider will request reimbursement only for Covered Services provided by only such staff holding any and all licenses required.

(J)  Cause its staff providing Covered Services to maintain staff privileges at Froedtert Memorial Lutheran Hospital and /or Children's Hospital of Wisconsin.

2

III.   Payment for Service

    (A)   Payment of Allowable Charge; Payment in Full. Each Entity shall agree in an Entity agreement to make payment, subject to the terms of its Plan, for Covered Services provided to Beneficiaries based on the lesser of the Actual Charge or Allowable Charge less copayments, coinsurance and deductibles and subject to coordination of benefits ("COB") rules. Physician shall in no event bill a Beneficiary any amount for Covered Services provided other than copayments, coinsurance and deductibles permitted under the applicable Plan.

    (B)   Medicare and Medicaid Assignment. With respect to Covered Services provided to any Beneficiary who is eligible for benefits under either the Medicare or Medicaid program, Physician shall accept assignment and not balance bill the applicable Plan or such Beneficiary for any medical services (though Physician may bill the Beneficiary for any copayments, coinsurance or deductibles permitted under the Medicare or Medicaid programs).

    (C)   Payment as Obligation of Entity. Physician acknowledges and agrees that Physician shall not bill or look to NCHA for any payment for services or otherwise hereunder. NCHA agrees that each Entity Agreement shall include the obligation of the Entity to make payments for Covered Services pursuant to the terms of this Agreement.

    (D)   Default by Entity. If an Entity defaults on its obligations under the Entity Agreement to make payment in a timely manner for Covered Services rendered by Physician, NCHA shall in no event be liable to Physician. Physician is a third party beneficiary with the right to enforce the obligation of the Entity to make payment in a timely manner for services rendered by Physician (Physician shall not, however, be a third party beneficiary of any other provision of the Entity Agreement).

    (E)   Claims Turnaround. Claims properly and fully completed in accordance with an Entity's Plan and for which Entity is the primary payor under coordination of benefit rules shall be paid within thirty (30) days of receipt thereof by Entity's insurer or current claims processor.

IV.   Billing

Physician agrees that it shall bill only the appropriate Entity for Covered Services provided to a Beneficiary and NCHA shall have no responsibility for payment of any charge for services rendered to any Beneficiary. Physician shall submit all claims for payment to Entity's current claims processor or insurer. All requests for payment shall be in and on a HCFA 1500 or its successor form. The following administrative procedures relating to claim submission apply:

    (A)   The claim submitted shall be based on Physician's Actual Charge for the Covered Service (even though payment may be made based on the Allowable Charge) and shall specify the CPT-4 and ICD-9 diagnosis codes for the Covered Service provided.

3

(B)   Physician shall refrain from providing claims for services which are duplicate charges or charge for separate service components.   Rather, Physician shall charge for the aggregate service per American Medical Association Current Procedural Terminology (CPT) 1997 (or the most currently released) coding conventions.   If there is any such duplication or unbundling of claims, Entity or its agents may re-code such claims in conformance with such coding conventions and payment of the recoded claim shall be considered the appropriate payment.

V.   Term; Termination

(A)   Term.  The initial term of this Agreement shall be from October 1, 1997 to December 31, 1998.   The term shall automatically renew for additional one (1) year periods on the same terms as are herein set forth, unless either party provides written notice of its decision not to renew the term at least sixty (60) days prior to the expiration of the then current term.

(B)   Termination.  This Agreement may be terminated as follows:

(1)   by either party with one hundred and twenty (120) days prior written notice to the other party; or

(2)   upon the conclusion of its term as described in Section V(A) hereof if the (sixty) 60 day written notice is provided;

(3)   if a party hereto breaches any of the terms or conditions hereof (specifically including entity as a third party beneficiary to this agreement, and specifically including Physician as third party beneficiary to this agreement) and such breach continues for a period of thirty (30) days after written notice thereof.   In the case of a breach by one or more Entities Physician shall have the option to terminate the Agreement only as to the defaulting Entity; or

(4)   if a party breaches any non-disclosure provision hereof including the provisions in Article VI(E).

Any such termination shall be without limitation on any other remedy available at law or in equity for a breach of contract.

VI.   Miscellaneous.

(A)   Cooperation in Quality Review.  Physician agrees that it shall have a policy or system to require that Covered Services rendered are of appropriate quality.   Physician agrees to participate in NCHA's pre-admission notification and ambulatory review program.

(B)   Coordination of Benefits.   If an Entity is the primary payor under applicable coordination of benefit ("COB") rules, provisions of an Entity's Plan not inconsistent with applicable COB rules or law or as otherwise mandated by law, then the Entity will pay the Allowable Charge, less any deductible, copayment or coinsurance subject to any maximums or other limitations set forth in the Plan.   If the Entity is other than the

4

primary payor under any such COB provisions, such rules, provisions, or law, Entity shall pay only those amounts which, after subtraction of any payments by the primary payor(s) constitute the remaining portion, if any, of the Allowable Charge, subject to maximums or other limitations set forth in the Plan. In no event will Entity be obligated to make a payment in excess of that portion of a secondary payment which, when combined with the primary payment equals the amount of the Allowable Charge less copayments, coinsurance and deductibles.

(C)   Entity List. Periodically, and upon the addition of a new Entity eligible hereunder, NCHA shall provide Physician with an up-to-date list of all Entities with whom NCHA has entered an Entity Agreement and thus which Entities are entitled under the provisions and obligations of this Agreement to the benefits of this Agreement from Physician. Any such Entity included on such a list shall be a third party Beneficiary hereto, but such Entity shall be entitled to enforce this Agreement only if Entity has requested NCHA to enforce the applicable provision and NCHA has refused to do so. NCHA upon thirty (30) days prior written notice to Physician, modify the list of Entities including withdrawals of certain Entities from eligibility hereunder.

(D)   Authorization. Physician hereby specifically authorizes NCHA to act in contracting with Entities for the provisions of Covered Services to Beneficiaries for the Allowable Charges determined pursuant to Exhibit A.

(E)   Confidentiality of Medical Records. Physician agrees and is responsible for compliance by physician with any and all legal requirements governing the confidentiality of medical records and shall take appropriate steps to prevent against unauthorized disclosures but in no event will physician be responsible for any disclosures by or use of such information by an Entity or NCHA.

(F)   Governing Law. This Agreement shall be interpreted, construed and governed under the laws of the State of Wisconsin.

(G)   Publicity; Advertising; Non-disclosure. Each party agrees that it shall not advertise or publicly disclose in print or broadcast media intended for public dissemination the existence of this Agreement or any affiliation or relationship with the other party without the prior written consent of the other party. In addition, Physician shall not discuss or disclose the fees herein with any other medical services provider.

(H)   Severability. In the event that any provision of this Agreement is found unenforceable by a court of competent jurisdiction, the remaining provisions hereof shall remain in full force and effect.

(I)   Misrepresentation. Any deliberate falsification of information about individual providers shall constitute grounds for voiding of this Agreement.

(J)   Notices. All notices which are given by a party hereto shall be in writing and shall be personally delivered or sent by U.S. certified mail, return receipt requested,

5

If to NCHA:

NCHA, Inc.
C/O Bowers & Associates
1100 Commerce Drive, Suite 100
Racine, WI 53406

and if to Physician:

Medical College of Wisconsin
P. O. Box 26188
Milwaukee, Wisconsin 53226-0188
ATT: Senior Associate Dean for Clinical Affairs

Notice shall be deemed received for purposes of this Agreement when delivered (if hand delivered) or upon signing of (or refusal to sign) the return receipt. Any party may change the address for notice by a notice given in conformance herewith.

(K)    <u>Indemnification</u>.

     (1)    Physician agrees to and hereby does defend, indemnify and hold Entity, and their respective officers, directors, shareholders, employees and agents harmless from and against any cost, loss, liability, damage, expense or settlement costs (including reasonable attorneys' fees) arising from any claim, suit or proceeding, whether proven or not, relating to (a) the delivery or provision of any care or services or the failure to provide medically indicated services or care by Physician, or (b) the failure of Physician or their respective employees or agents to fulfill its or their obligations under this Agreement or the negligent or wrongful performance of such obligations.

     (2)    Entity agrees to and hereby does defend, indemnify and hold Physician, and its directors, shareholders, employees and agents harmless from and against any cost, loss, liability, damage, expense or settlement costs (including reasonable attorneys' fees) a arising from any claim, suit or proceeding, whether proven or not, relating to the failure of Entity or its agents including without limitation NCHA to fulfill its or their obligations under this Agreement or the negligent or wrongful performance of such obligations.

(L)    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and it supersedes all prior and contemporaneous understandings, negotiations, and discussions, oral or written. There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth herein.. This Agreement may only be amended in writing and signed by both parties.

6



(M)   <u>Assignment</u>. Neither party may assign this Agreement or any interest herein or subcontract any services hereunder without the prior written consent of the other party. It is understood that NCHA may contract with Entities who may have become entitled to have their Beneficiaries receive Covered Services pursuant hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

NORTH CENTRAL HEALTH CARE
ALLIANCE, INC.

By: _____

Its: _____

Date: _____9/26/97._____

MEDICAL COLLEGE OF WISCONSIN
PHYSICIANS & CLINICS

By: _John Eversmen MD_

Its: _____

Date: ____9/22/97____

FTIN: ___39-0806261___

7

<u>**EXHIBIT A**</u>
<u>**Fee Schedule**</u>

MEDICAL COLLEGE OF WISCONSIN

<u>**Group Health**</u>

I.   Physician Services will be subject to a **REDACTED** discount off Actual Charges.

<u>**Workers Compensation**</u>

I.   Physician Services will be subject to a **REDACTED** discount off Actual Charges.

8

## EXHIBIT B

### LIST OF ENTITIES

Community Health Care, Inc.

Eye Clinic of Wisconsin

Greenheck Fan Corporation

Kolbe & Kolbe Millworks, Inc.

Marathon Cheese Corporation

Marathon County

Marathon Electric Manufacturing Corporation

Mosinee Paper Corporation

Sorg Paper Company

Wausau Coated Products, Inc.

Wausau Concrete

Wausau Metals

9

**Amendment**
**To the Physician Agreement between**
**NORTH CENTRAL HEALTH CARE ALLIANCE, INC.**
**and**
**MEDICAL COLLEGE OF WISCONSIN**

**This Amendment** is made and entered into as of the 1st day of July 2003 by and between **MEDICAL COLLEGE OF WISCONSIN** ("Physician") and **NORTH CENTRAL HEALTH CARE ALLIANCE, INC.** ("NCHA") a corporation organized in the State of Wisconsin.

**WHEREAS,** Physician and NCHA entered into a Physician Agreement effective October 1, 1997 pursuant to which Physician agreed to provide health care services on the terms herein defined; and

**WHEREAS,** Physician and NCHA are desirous of amending the Agreement as herein stated:

**NOW THEREFORE,** for a good and valuable consideration the adequacy and receipt of which are acknowledged, it is agreed as follows:

1.  <u>Section I (G):</u>  shall be deleted in its entirety and replaced with the following:

    "Plan" shall mean Entity's self-insured Medical Benefit Plan, pursuant to which Entity is obligated to make payment for health care services, including Covered Services, for such Beneficiaries.  Worker's compensation or automobile insurance policies shall not be included or applicable under this definition or Agreement.

2.  <u>EXHIBIT A:</u>  the reference within EXHIBIT A to "Workers Compensation"(I) shall be deleted in its entirety.  All references to worker's compensation shall be deleted from the Agreement as of the effective date of this Amendment.

3.  Section K, Indemnification shall be deleted in its entirety from this Agreement.

4.  Except as herein amended the Agreement shall continue unmodified and (as herein amended) shall continue in full force and effect.

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the date first set forth above.

**NORTH CENTRAL HEALTH CARE**          **MEDICAL COLLEGE OF**
**ALLIANCE, INC.**                                          **WISCONSIN**

By: _G J Bowe_                                    By: _B. P. Kohowl_____

Its: _PRESIDENT_                                    Its: _Sr Associate Dean for_
                                                                _Clinical Affairs_

Date: _6/30/03_                                      Date: _7/6/03_

                                                              TIN: _390806261_

# PROVIDER AGREEMENT

This Agreement is by and between **CHILDREN'S HEALTH SYSTEM** and its **Affiliated Entities** ("Provider") and **BOWERS & ASSOCIATES, INC. d/b/a PARADIGM NETWORK** ("Bowers") a corporation organized in the State of Wisconsin. In consideration for their mutual warranties and agreements as set forth herein, the parties hereto agree as follows:

## RECITALS

Whereas, Bowers has entered or intends to enter contracts with Entities (hereafter defined), who will make payment for certain health care expenditures incurred by their employees, dependents and other designated individuals eligible to have their health care paid for by such Entities, to arrange for the provision of certain health care services; and,

Whereas, Provider is desirous of contracting with Bowers to provide services for Beneficiaries (defined below) eligible to receive health care paid for by Entities, on and subject to the terms and conditions hereof; and,

Whereas, Bowers is desirous of offering the services of Provider to Beneficiaries (as hereafter defined) of Entities (also as hereafter defined) on and subject to the terms and conditions hereof.

Now, therefore, for a good and valuable consideration, Provider and Bowers agree as follows:

I.   Definitions

As used herein the following terms have the indicated meanings:

(A)   "Actual Charge" shall mean the charge which Provider normally bills for the indicated medical service.

(B)   "Allowable Charge" shall mean the fees set forth on Exhibit A for Covered Services based on the principal diagnosis.

(C)   "Beneficiary" or "Beneficiaries" shall mean any employee, retiree or any of their respective dependents or any other persons participating under a Plan of an Entity and who are eligible to have their medical services paid for under the terms of a Plan of an Entity (the term includes those eligible under COBRA).

(D)   "Covered Services" shall mean those medical services covered under a Plan, subject to any limitations on such coverage as may be contained in such Plan from time to time.

001.883154.2

EXHIBIT
C

(E)   "Entity" shall mean any employer, including any corporation, organization, partnership, proprietorship, governmental unit, or other legal body with whom Bowers has contracted or may hereafter contract and which has an obligation to pay for Covered Services or provide benefits for Covered Services provided to a Beneficiary, which Covered Services are provided under the terms of this Agreement, provided that Bowers has furnished (and not withdrawn) or agrees to furnish a written notice to Provider that such employer is an Entity hereunder.  It is understood that those qualifying as Entities hereunder may change from time to time.  Entity will offer Paradigm network as its only preferred provider option for its Beneficiaries.

(F)   "Entity Agreement" shall mean a contract between an Entity and Bowers pursuant to which an entity acknowledges and agrees to be an Entity hereunder and to make payment to Provider for medical care (including Covered Services) rendered pursuant to the terms of this Agreement to its Beneficiaries.

(G)   "Plan" shall mean an Entity's self-insured Medical Benefit Plan, as its terms may be modified from time to time, and an Entity's workers compensation insurance policy, disability program and/or Entity's insurance policy or other contract or arrangement pursuant to which an Entity is obligated to make payment for health care services, including Covered Services, for such Entity's Beneficiaries, payment pursuant to which is subject to the terms and provisions of such plan, policy, contract or other arrangement.  Entity shall provide financial steerage mechanisms to encourage Beneficiaries to use preferred Provider.

II.   Agreements of Provider

Provider agrees that at all times it will:

(A)   Provide Covered Services to Beneficiaries for the Allowable Charges as determined pursuant to Exhibit A.

(B)   Accept the Allowable Charges, determined on the basis of the principal diagnosis or procedure, as payment in full for Covered Services provided to Beneficiaries and not bill any Beneficiary for any amount (except for copayments, coinsurance, and deductibles which shall be deducted from the Allowable Charges set forth in Exhibit A).  Provider is responsible for billing and collecting all copayments, coinsurance, deductibles and non-covered services.

(C)   Provide Covered Services to Beneficiaries in the same manner and of the same quality and efficiency that Provider provides such services to other patients of Provider.

001.893154.2                                    -2-

(D)   Maintain all approvals, certificates, unrestricted licenses, certification as a Medicare and/or Medicaid Provider and consents necessary to operate his business and perform Covered Services.  Provider shall promptly notify Bowers (and authorizes Bowers to inform all Entities) of any exclusion or suspension of Provider or any individual or group providing any medical services on behalf of Provider, from the Medicare Program, the Medicaid Program or any federal or state funded health care program, or of any license held by Provider or any such group.  It is agreed and understood that not all professional staff are Medicare or Medicaid Providers.

(E)   Participate in any reasonable grievance procedure established by Bowers (or an Entity for its Beneficiaries) which provides a fair procedure for Beneficiary complaints, provided that such procedure shall not require Provider to settle any professional liability claim or lawsuit.

(F)   Maintain, for Provider and employed professionals providing or authorized to provide Covered Services hereunder, professional liability (malpractice) insurance as mandated by any applicable law or if there is no such legal mandate, then in amounts common for Providers in the community in which Provider provides services.  Provider shall notify Bowers of cancellation or material modification of the coverage under such professional liability insurance at least thirty (30) days prior to any cancellation or modification.  Certificates of insurance evidencing professional liability insurance shall be provided to Bowers upon written request.

(G)   Comply with all applicable laws and/or regulations (including confidentiality laws) in the delivery of medical and/or related services to Beneficiaries and the submission of data.  Such laws include the Health Information Portability and Accountability Act ("HIPAA").

(H)   Ensure that all of Provider's staff providing Covered Services hold all licenses, approvals and certifications legally required to provide Covered Services to Beneficiaries that Provider provides and to participate in the Medicare and Medicaid program to perform such services.

(I)   Ensure that all Covered Services provided by Provider shall be provided by staff which holds any and all licenses required by applicable law and only under the supervision of a Provider.

(J)   Maintain hospital staff membership and privileges at at least one Bowers contracted hospital.

III.   **Payment for Service**

(A)   <u>Payment of Allowable Charge; Payment in Full</u>.  Each Entity shall agree in an Entity Agreement to make payment to Provider, subject to the terms of its Plan,

for Covered Services provided by Provider to Beneficiaries (who are not Medicare or Medicaid eligible) in the amount of the lesser of the Actual Charge or the Allowable Charge, less copayments, coinsurance and deductibles and subject to coordination of benefits ("COB") rules. Provider shall in no event bill a Beneficiary any amount for Covered Services provided other than copayments, coinsurance and deductibles permitted under the applicable Plan.

(B)     <u>Medicare and Medicaid Assignment</u>.  With respect to Covered Services provided to any Beneficiary who is eligible for benefits under either the Medicare or Medicaid program, Provider shall accept assignment and not balance bill the applicable Plan or such Beneficiary for any medical services (though Provider may bill the Beneficiary for any copayments, coinsurance, deductibles and permitted under the Medicare or Medicaid programs).

(C)     <u>Payment as Obligation of Entity</u>.  Provider acknowledges and agrees that Bowers is not paying Provider or any other person or entity for any services hereunder.  Provider shall not bill or look to Bowers for any payment for any services or any items hereunder.  Provider shall hold Bowers harmless from any and all such billings.  Bowers agrees that each Entity Agreement shall include the obligation of the Entity to make payments for Covered Services pursuant to the terms of this Agreement.  Such Entity Agreement shall include a provision that Bowers-contracted Providers (which includes Provider) shall be third party beneficiaries of the Entity Agreement entitled to enforce the payment obligation of the Entity to Provider.

(D)     <u>Default by Entity</u>.  If an Entity defaults on its obligations under the Entity Agreement to make payment in a timely manner for Covered Services rendered by Provider, Bowers shall in no event be liable to Provider.  The Entity Agreement shall provide that contracted Providers are third party beneficiaries with the right to enforce the obligation of the Entity to make payment in a timely manner for services rendered.  (Provider shall not, however, be a third party beneficiary of any other provision of the Entity Agreement).  In the event Entity does not satisfy its responsibility to fund its claims expense, the Provider may pursue reimbursement for Covered Services from the Beneficiary of that Plan.

(E)     <u>Claims Turnaround</u>.  Each Entity Agreement shall provide that claims properly and fully completed in accordance with an Entity's Plan and for which Entity is the primary payor under coordination of benefit rules shall be paid within thirty (30) days of receipt thereof by Entity's current claims processor or insurer.  If Entity's claims processor fails to pay claim to Provider within one hundred eighty days (180) days of receipt, Entity shall waive its right to that discount for the identified claim.

IV.     <u>Billing</u>

Provider agrees that it shall bill only the appropriate Entity at an address indicated on the Beneficiary identification card provided by Entity for Covered Services provided to a Beneficiary and Bowers shall have no responsibility for payment of any charge for services rendered to any Beneficiary. Provider shall submit all claims for payment to the address indicated by Entity. All requests for payment shall be made on the UB-92 for hospital claims and the HCFA 1500 for professional services. The following administrative procedures relating to claim submission apply:

(A) The claim submitted shall be based on Provider's Actual Charge for the Covered Service (even though payment may be made based on the Allowable Charge) and shall specify the appropriate diagnosis code and / or CPT-4 for the Covered Service.

(B) Provider shall refrain from providing claims for services which are duplicate charges or charge for separate service components. Rather, Provider shall charge for the aggregate service per American Medical Association Current Procedural Terminology (CPT) 2001 (or the most currently released) coding conventions. If there is any such duplication or unbundling of claims, Entity or its agents may re-code such claims in conformance with such coding conventions and payment of the recoded claim shall be considered the appropriate payment.

(C) Provider agrees that all submissions of patient health information and other records shall comply with HIPAA and regulations promulgated thereunder concerning standards for electronic transactions and code sets. Provider recognizes such standards and code sets, when applicable, will apply not just to billing and claims submission transactions. All forms will be presented so as to comply with the provisions thereof.

## V.   Term; Termination

(A) **Term.** The initial term of this Agreement shall be from April 1, 2001 to March 31, 2002. The term shall automatically renew for additional one (1) year periods on the same terms as are herein set forth, unless either party provides written notice of its decision not to renew the term at least sixty (60) days prior to the expiration of the then current term.

(B) **Termination.** This Agreement may be terminated as follows:

a.   mutual consent of the parties;

b.   upon the conclusion of its term as described in Section V(A) hereof if the sixty (60) day written notice is provided;

c.   if a party hereto breaches any of the terms or conditions hereof;

    d.    in the event an Entity fails to make payment for Covered Services provided hereunder and such failure continues for thirty (30) days after written notice, Provider may terminate this Agreement but only as to such Entity. In the case of a breach by one or more Entities, Provider shall have the option to terminate the Agreement only as to the defaulting Entity; or

    e.    immediately, on written notice, if a party breaches any non-disclosure provision hereof including the provisions in Article VI(E).

Any such termination shall be without limitation on any other remedy available at law or in equity for a breach of contract.

**VI.**    <u>Miscellaneous</u>.

    (A)    <u>Cooperation in Quality Review</u>. Provider agrees that it shall have a policy or system to ensure that Covered Services rendered are of appropriate quality. Provider agrees to use its best efforts to participate in Bowers pre-admission notification and ambulatory review program. If there is any material change in Bowers pre-admission notification and ambulatory review program, Bowers will provide Provider with sixty (60) day prior written notification.

    (B)    <u>Coordination of Benefits</u>. If an Entity is the primary payor under applicable coordination of benefit ("COB") rules, provisions of an Entity's Plan or as otherwise mandated by law, then the Entity will pay the Allowable Charge, less any deductible, copayment or coinsurance subject to any maximums or other limitations set forth in the Plan. If the Entity is other than the primary payor under any such COB provisions, Entity shall pay only those amounts which, after subtraction of any payments by the primary payor(s) constitute the remaining portion, if any, of the Allowable Charge, subject to maximums or other limitations set forth in the Plan. In no event will Entity be obligated to make a payment in excess of that portion of a secondary payment which, when combined with the primary payment equals the amount of the Allowable Charge less copayments, coinsurance and deductibles.

    (C)    <u>Entity List</u>. Periodically, and upon the addition of a new Entity eligible hereunder Bowers will provide thirty (30) days prior notice of an addition of a new Entity to this Agreement. Bowers shall also provide Provider with an up-to-date list of all Entities to Provider upon any change (additions or deletions) to <u>Exhibit B</u> and with whom Bowers has entered an Entity Agreement and thus which Entities are entitled under the provisions and obligations of this Agreement to the benefits of this Agreement from Provider (and are responsible to make payment for Covered Services). Any such Entity included on such a list shall be a third party Beneficiary hereto, but such Entity shall be entitled to enforce this Agreement only if Entity has requested Bowers to enforce the

applicable provision and Bowers has refused to do so. Bowers may, on written notice to Provider, modify the list of Entities, including withdrawals of certain Entities from eligibility hereunder.

(D) <u>Authorization</u>. Provider hereby specifically authorizes Bowers to act, in its discretion, in contracting with any individual or group for the provisions of Covered Services to Beneficiaries for the Allowable Charges or Actual Charges determined pursuant to <u>Exhibit A</u>. Bowers shall offer Provider's services to all such prospective Entities.

(E) <u>Confidentiality of Medical Records</u>. Provider agrees and is responsible for compliance with any and all legal requirements governing the confidentiality of medical records and shall take appropriate steps to ensure against unauthorized disclosures. Provider in particular agrees, as a condition to any payment, to obtain any written consent necessary to submit all claims to the third party administrator and all medical records supporting a claim for payment and for care management to Bowers to permit Bowers to perform its duties hereunder. The consent will authorize disclosure of all documentation to Bowers with adequate specificity to sufficiently document the need for the Covered Service provided and the provision of the Covered Service and shall be in a form to comply with all laws necessary for such consent. The consent shall cover the sharing of mental health records and alcohol and drug abuse records. Bowers and Provider agree to execute any written agreement required by law, including any business partner agreement required by HIPAA to permit, Bowers access to all information necessary or appropriate for Bowers to perform its obligations hereunder. In no event shall Provider be liable for claims, damages, liabilities, costs or expenses related to Bowers failure to maintain confidentiality of patient medical records.

(F) <u>Governing Law</u>. This Agreement shall be interpreted, construed and governed under the laws of the State of Wisconsin.

(G) <u>Publicity; Advertising; Non-disclosure</u>. Provider agrees that it shall not advertise or publicly disclose in print or broadcast media intended for public dissemination the existence of this Agreement or any affiliation or relationship with Bowers or any Entity without the prior written consent of Bowers and the appropriate Entity. Both parties agree that it may use the others parties name in a general listing. In addition, Provider shall not discuss or disclose the fees herein with any other medical services Provider.

(H) <u>Severability</u>. In the event that any provision of this Agreement is found unenforceable by a court of competent jurisdiction, the remaining provisions hereof shall remain in full force and effect.

(I) <u>Misrepresentation</u>. Any misrepresentation of information set forth on <u>Exhibit C</u> the Provider Information Form, will permit Bowers to terminate this Agreement

on written notice to Provider.  Provider authorizes Bowers to access the National Practitioner's Data concerning Practitioner and agrees to sign all documentation, consents and approvals requested by Bowers to confirm any information concerning Provider and the matters in this Agreement and its exhibits.

(J)     Notices.  All notices which are given by a party hereto shall be in writing and shall be personally delivered or sent by U.S. certified mail, return receipt requested,

If to BOWERS:

Bowers & Associates, Inc.
9779 S. Franklin Drive, Suite 100
Franklin, WI 53132
ATTN: Director, Provider Relations

and if to Provider:

CHILDREN'S HEALTH SYSTEM
9000 W. Wisconsin Ave.
P.O. Box 1997
Milwaukee, WI 53201
ATTN: Director, Managed Care

Notice shall be deemed received for purposes of this Agreement when delivered (if hand delivered) or upon signing of (or refusal to sign) the return receipt.  Any party may change the address for notice by a notice given in conformance herewith.

(K)     Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and it supersedes all prior and contemporaneous understandings, negotiations, and discussions, oral or written.  There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth herein.  This Agreement may only be amended in writing and signed by both parties.

(L)     Assignment.  Neither party may assign this Agreement or any interest herein or subcontract any services hereunder without the prior written consent of the other party. It is understood that Bowers may contract with Entities who may have become entitled to have their Beneficiaries receive Covered Services pursuant hereto.

(M)     Ownership of Intellectual Property.

001.893154.2                                    -8-

a.   <u>Bowers' Intellectual Property</u>.  Provider agrees that Bowers shall remain the owner of any material or content provided under this Agreement by Bowers.  Any intellectual property rights, including but not limited to patent, trademark, copyright and trade secret rights, existing in any material or content provided by Bowers under this Agreement including, without limitation, the Paradigm Partners Tools provided hereunder, are the exclusive property of Bowers and Provider has and develops no ownership interest in such rights by virtue of this Agreement.  Provider agrees to cooperate with Bowers in protecting such intellectual property, including cooperation with the registration of Bowers of any intellectual property rights.

b.   <u>Providers' Intellectual Property</u>.  Bowers agrees that Provider shall remain the owner of any material or content provided under this Agreement by Provider.  Any intellectual property rights, including but not limited to patent, trademark, copyright and trade secret rights, existing in any material or content provided by Provider under this Agreement are the exclusive property of Provider and Bowers has and develops no ownership interest in such rights by virtue of this Agreement.

   **IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

**BOWERS & ASSOCIATES, INC.**

By: _____

Its: _President & CEO_____

Date: _2|23|01_____

**CHILDREN'S HEALTH SYSTEM**

By: _____

Its: _President + CEO_____

Date: _2/21/01_____

TIN: _____

**EXHIBIT A**
**CHILDREN'S HEALTH SYSTEM**
Fee Schedule

**CHILDREN'S HOSPITAL OF WISCONSIN, INC.**
**IRS: 39-0812532**

I.  Medical, Surgical, Hematology and Oncology Inpatient Stays REDACTED discount off Provider's Actual Charges.

II.  Pediatric Intensive Care, Neonatal Intensive Care and Transplant Stays, REDACTED discount off Provider's Actual Charges.

III.  All Outpatient Services, REDACTED discount off Provider's Actual Charges.

IV.  Physician Professional Services, REDACTED discount off Actual Charges when billed under the Provider Federal Tax Identification number.

**SURGICENTER OF GREATER MILWAUKEE**
**IRS: 39-1682308**

I.  Provider agrees to accept REDACTED discount off Actual Charges.

**CHILDREN'S HEALTH SYSTEM**
**"URGENT CARE CENTERS"**
**IRS: 39-1500074**

I.  Provider agrees to accept REDACTED discount off Actual Charges.

12.2000

Exhibit A – Page 1

## EXHIBIT B

## CURRENT LIST OF ENTITIES
### (Bowers may modify the list at any time)

MEI, Inc.
City of Racine - Wisconsin
County of Racine - Wisconsin
Golden Books Publishing Company, Inc.
In-Sink-Erator, a division of Emerson Electric Co.
Johnson International, Inc.
Modine Manufacturing Company
Racine Unified School District
Sauer – Danfoss, Inc.
S. C. Johnson and Son, Inc.
S. C. Johnson Commercial Markets
Simplicity Manufacturing, Inc.
Brown County – Wisconsin
Oneida Tribe of Indians of Wisconsin
VPI, LLC
North Central Health Care Alliance, Inc.
Bay West Paper Corporation
County Concrete Industries
Fiskars, Consumer Products, Inc.
Greenheck Fan Corporation
Kolbe & Kolbe Millworks, Co., Inc.
Marathon Cheese Corporation
Marathon County
Marathon Electric Manufacturing Corporation
Packaging Tape, Inc.
SNE Enterprises, Inc.
Wausau - Mosinee Paper Corporation
Wausau Benefits, Inc.
Wausau Concrete Industries

**Exhibit C**
**CHILDREN'S HEALTH SYSTEM**
**OF WISCONSIN**
Provider Information Form

**Children's Hospital of Wisconsin, Inc.**
**SurgiCenter of Greater Milwaukee**
**Children's Health System of Wisconsin "Urgent Care Centers"**

## PHYSICIAN AGREEMENT

This Agreement is by and between **CHILDREN'S MEDICAL GROUP** ("Physician") and **BOWERS & ASSOCIATES, INC. d/b/a PARADIGM NETWORK** ("Bowers") a corporation organized in the State of Wisconsin. In consideration for their mutual warranties and agreements as set forth herein, the parties hereto agree as follows:

## RECITALS

**Whereas,** Bowers has entered or intends to enter contracts with Entities (hereafter defined), who will make payment for certain health care expenditures incurred by their employees, dependents and other designated individuals eligible to have their health care paid for by such Entities, to arrange for the provision of certain health care services; and,

**Whereas,** Physician is desirous of contracting with Bowers to provide services for Beneficiaries (defined below) eligible to receive health care paid for by Entities, on and subject to the terms and conditions hereof; and,

**Whereas,** Bowers is desirous of offering the services of Physician to Beneficiaries (as hereafter defined) of Entities (also as hereafter defined) on and subject to the terms and conditions hereof.

**Now, therefore,** for a good and valuable consideration, Physician and Bowers agree as follows:

I.    Definitions

As used herein the following terms have the indicated meanings:

(A)    "Actual Charge" shall mean the charge which Physician normally bills for the indicated medical service.

(B)    "Allowable Charge" shall mean the fees set forth on Exhibit A for Covered Services based on the principal diagnosis.

(C)    "Beneficiary" or "Beneficiaries" shall mean any employee, retiree or any of their respective dependents or any other persons participating under a Plan of an Entity and who are eligible to have their medical services paid for under the terms of a Plan of an Entity (the term includes those eligible under COBRA).

(D)    "Covered Services" shall mean those medical services covered under a Plan, subject to any limitations on such coverage as may be contained in such Plan from time to time.

001.893154.2



(E)   "Entity" shall mean any employer, including any corporation, organization, partnership, proprietorship, governmental unit, or other legal body with whom Bowers has contracted or may hereafter contract and which has an obligation to pay for Covered Services or provide benefits for Covered Services provided to a Beneficiary, which Covered Services are provided under the terms of this Agreement, provided that Bowers has furnished (and not withdrawn) or agrees to furnish a written notice to Physician that such employer is an Entity hereunder.  It is understood that those qualifying as Entities hereunder may change from time to time.  Entity will offer Paradigm network as its only preferred provider option for its Beneficiaries.

(F)   "Entity Agreement" shall mean a contract between an Entity and Bowers pursuant to which an entity acknowledges and agrees to be an Entity hereunder and to make payment to Physician for medical care (including Covered Services) rendered pursuant to the terms of this Agreement to its Beneficiaries.

(G)   "Plan" shall mean an Entity's self-insured Medical Benefit Plan, as its terms may be modified from time to time, and an Entity's workers compensation insurance policy, disability program and/or Entity's insurance policy or other contract or arrangement pursuant to which an Entity is obligated to make payment for health care services, including Covered Services, for such Entity's Beneficiaries, payment pursuant to which is subject to the terms and provisions of such plan, policy, contract or other arrangement.  Entity shall provide financial steerage mechanisms to encourage Beneficiaries to use preferred Physician.

II.    Agreements of Physician

Physician agrees that at all times it will:

(A)   Provide Covered Services to Beneficiaries for the Allowable Charges as determined pursuant to Exhibit A.

(B)   Accept the Allowable Charges, determined on the basis of the principal diagnosis or procedure, as payment in full for Covered Services provided to Beneficiaries and not bill any Beneficiary for any amount (except for copayments, coinsurance, and deductibles which shall be deducted from the Allowable Charges set forth in Exhibit A).  Physician is responsible for billing and collecting all copayments, coinsurance, deductibles and non-covered services.

(C)   Provide Covered Services to Beneficiaries in the same manner and of the same quality and efficiency that Physician provides such services to other patients of Physician.

(D)    Maintain all approvals, certificates, unrestricted licenses, certification as a Medicare and/or Medicaid Physician and consents necessary to operate his business and perform Covered Services.  Physician shall promptly notify Bowers (and authorizes Bowers to inform all Entities) of any exclusion or suspension of Physician or any individual or group providing any medical services on behalf of Physician, from the Medicare Program, the Medicaid Program or any federal or state funded health care program, or of any license held by Physician or any such group.  It is agreed and understood that not all professional staff are Medicare or Medicaid Physicians.

(E)    Participate in any reasonable grievance procedure established by Bowers (or an Entity for its Beneficiaries) which provides a fair procedure for Beneficiary complaints, provided that such procedure shall not require Physician to settle any professional liability claim or lawsuit.

(F)    Maintain, for Physician and employed professionals providing or authorized to provide Covered Services hereunder, professional liability (malpractice) insurance as mandated by any applicable law or if there is no such legal mandate, then in amounts common for Physicians in the community in which Physician provides services.  Physician shall notify Bowers of cancellation or material modification of the coverage under such professional liability insurance at least thirty (30) days prior to any cancellation or modification.  Certificates of insurance evidencing professional liability insurance shall be provided to Bowers upon written request.

(G)    Comply with all applicable laws and/or regulations (including confidentiality laws) in the delivery of medical and/or related services to Beneficiaries and the submission of data.  Such laws include the Health Information Portability and Accountability Act ("HIPAA").

(H)    Ensure that all of Physician's staff providing Covered Services hold all licenses, approvals and certifications legally required to provide Covered Services to Beneficiaries that Physician provides and to participate in the Medicare and Medicaid program to perform such services.

(I)    Ensure that all Covered Services provided by Physician shall be provided by staff which holds any and all licenses required by applicable law and only under the supervision of a Physician.

(J)    Maintain hospital staff membership and privileges at at least one Bowers contracted hospital.

(K)    Physician will use reasonable efforts to accept "new" Beneficiaries for treatment in accordance with all terms and conditions of this Agreement.  Physician will ensure that medical and health care services are available to Beneficiary 24

hours a day, 7 days a week.  Physician will provide advance written notice
whenever Physician closes or limits their practice to accepting new patients.

III.    Payment for Service

(A)    Payment of Allowable Charge; Payment in Full.  Each Entity shall agree in an
Entity Agreement to make payment to Physician, subject to the terms of its
Plan, for Covered Services provided by Physician to Beneficiaries (who are not
Medicare or Medicaid eligible) in the amount of the lesser of the Actual Charge
or the Allowable Charge, less copayments, coinsurance and deductibles and
subject to coordination of benefits ("COB") rules. Physician shall in no event
bill a Beneficiary any amount for Covered Services provided other than
copayments, coinsurance and deductibles permitted under the applicable Plan.

(B)    Medicare and Medicaid Assignment.  With respect to Covered Services
provided to any Beneficiary who is eligible for benefits under either the
Medicare or Medicaid program, Physician shall accept assignment and not
balance bill the applicable Plan or such Beneficiary for any medical services
(though Physician may bill the Beneficiary for any copayments, coinsurance,
deductibles and permitted under the Medicare or Medicaid programs).

(C)    Payment as Obligation of Entity.  Physician acknowledges and agrees that
Bowers is not paying Physician or any other person or entity for any services
hereunder.  Physician shall not bill or look to Bowers for any payment for any
services or any items hereunder.  Physician shall hold Bowers harmless from
any and all such billings.  Bowers agrees that each Entity Agreement shall
include the obligation of the Entity to make payments for Covered Services
pursuant to the terms of this Agreement.  Such Entity Agreement shall include a
provision that Bowers-contracted Physicians (which includes Physician) shall be
third party beneficiaries of the Entity Agreement entitled to enforce the payment
obligation of the Entity to Physician.

(D)    Default by Entity.  If an Entity defaults on its obligations under the Entity
Agreement to make payment in a timely manner for Covered Services rendered
by Physician, Bowers shall in no event be liable to Physician.  The Entity
Agreement shall provide that contracted Physicians are third party beneficiaries
with the right to enforce the obligation of the Entity to make payment in a timely
manner for services rendered.  (Physician shall not, however, be a third party
beneficiary of any other provision of the Entity Agreement).  In the event Entity
does not satisfy its responsibility to fund its claims expense, the Physician may
pursue reimbursement for Covered Services from the Beneficiary of that Plan.

(E)    Claims Turnaround.  Each Entity Agreement shall provide that claims properly
and fully completed in accordance with an Entity's Plan and for which Entity is
the primary payor under coordination of benefit rules shall be paid within thirty
(30) days of receipt thereof by Entity's current claims processor or insurer.  If

Entity's claims processor fails to pay claim to Physician within one hundred eighty days (180) days of receipt, Entity shall waive its right to that discount for the identified claim.

IV.   Billing

Physician agrees that it shall bill only the appropriate Entity at an address indicated on the Beneficiary identification card provided by Entity for Covered Services provided to a Beneficiary and Bowers shall have no responsibility for payment of any charge for services rendered to any Beneficiary. Physician shall submit all claims for payment to the address indicated by Entity. All requests for payment shall be made on the UB-92 for hospital claims and the HCFA 1500 for professional services. The following administrative procedures relating to claim submission apply:

(A)   The claim submitted shall be based on Physician's Actual Charge for the Covered Service (even though payment may be made based on the Allowable Charge) and shall specify the appropriate diagnosis code and / or CPT-4 for the Covered Service.

(B)   Physician shall refrain from providing claims for services which are duplicate charges or charge for separate service components. Rather, Physician shall charge for the aggregate service per American Medical Association Current Procedural Terminology (CPT) 2001 (or the most currently released) coding conventions. If there is any such duplication or unbundling of claims, Entity or its agents may re-code such claims in conformance with such coding conventions and payment of the recoded claim shall be considered the appropriate payment.

(C)   Physician agrees that all submissions of patient health information and other records shall comply with HIPAA and regulations promulgated thereunder concerning standards for electronic transactions and code sets. Physician recognizes such standards and code sets, when applicable, will apply not just to billing and claims submission transactions. All forms will be presented so as to comply with the provisions thereof.

V.   Term; Termination

(A)   Term. The initial term of this Agreement shall be from February 1, 2003 to January 31, 2004. The term shall automatically renew for additional one (1) year periods on the same terms as are herein set forth, unless either party provides written notice of its decision not to renew the term at least sixty (60) days prior to the expiration of the then current term.

(B)   Termination. This Agreement may be terminated as follows:

001.893154.2

a.   mutual consent of the parties;

b.   upon the conclusion of its term as described in Section V(A) hereof if the sixty (60) day written notice is provided;

c.   if a party hereto breaches any of the terms or conditions hereof;

d.   ·in the event an Entity fails to make payment for Covered Services provided hereunder and such failure continues for thirty (30) days after written notice, Physician may terminate this Agreement but only as to such Entity. In the case of a breach by one or more Entities, Physician shall have the option to terminate the Agreement only as to the defaulting Entity; or

e.   immediately, on written notice, if a party breaches any non-disclosure provision hereof including the provisions in Article VI(E).

Any such termination shall be without limitation on any other remedy available at law or in equity for a breach of contract.

VI.   <u>Miscellaneous.</u>

(A)   <u>Cooperation in Quality Review.</u>   Physician agrees that it shall have a policy or system to ensure that Covered Services rendered are of appropriate quality. Physician agrees to use its best efforts to participate in Bowers pre-admission notification and ambulatory review program. If there is any material change in Bowers pre-admission notification and ambulatory review program, Bowers will provide Physician with sixty (60) day prior written notification.

(B)   <u>Coordination of Benefits.</u>   If an Entity is the primary payor under applicable coordination of benefit ("COB") rules, provisions of an Entity's Plan or as otherwise mandated by law, then the Entity will pay the Allowable Charge, less any deductible, copayment or coinsurance subject to any maximums or other limitations set forth in the Plan. If the Entity is other than the primary payor under any such COB provisions, Entity shall pay only those amounts which, after subtraction of any payments by the primary payor(s) constitute the remaining portion, if any, of the Allowable Charge, subject to maximums or other limitations set forth in the Plan. In no event will Entity be obligated to make a payment in excess of that portion of a secondary payment which, when combined with the primary payment equals the amount of the Allowable Charge less copayments, coinsurance and deductibles.

(C)   <u>Entity List.</u>   Periodically, and upon the addition of a new Entity eligible hereunder Bowers will provide thirty (30) days prior notice of an addition of a new Entity to this Agreement. Bowers shall also provide Physician with an up-to-date list of all Entities to Physician upon any change (additions or deletions)

001.893154.2                                    -6-

to <u>Exhibit B</u> and with whom Bowers has entered an Entity Agreement and thus which Entities are entitled under the provisions and obligations of this Agreement to the benefits of this Agreement from Physician (and are responsible to make payment for Covered Services). Any such Entity included on such a list shall be a third party Beneficiary hereto, but such Entity shall be entitled to enforce this Agreement only if Entity has requested Bowers to enforce the applicable provision and Bowers has refused to do so. Bowers may, on written notice to Physician, modify the list of Entities, including withdrawals of certain Entities from eligibility hereunder.

(D) <u>Authorization</u>. Physician hereby specifically authorizes Bowers to act, in its discretion, in contracting with any individual or group for the provisions of Covered Services to Beneficiaries for the Allowable Charges or Actual Charges determined pursuant to <u>Exhibit A</u>. Bowers shall offer Physician's services to all such prospective Entities.

(E) <u>Confidentiality of Medical Records</u>. Physician agrees and is responsible for compliance with any and all legal requirements governing the confidentiality of medical records and shall take appropriate steps to ensure against unauthorized disclosures. Physician in particular agrees, as a condition to any payment, to obtain any written consent necessary to submit all claims to the third party administrator and all medical records supporting a claim for payment and for care management to Bowers to permit Bowers to perform its duties hereunder. The consent will authorize disclosure of all documentation to Bowers with adequate specificity to sufficiently document the need for the Covered Service provided and the provision of the Covered Service and shall be in a form to comply with all laws necessary for such consent. The consent shall cover the sharing of mental health records and alcohol and drug abuse records. Bowers and Physician agree to execute any written agreement required by law, including any business partner agreement required by HIPAA to permit, Bowers access to all information necessary or appropriate for Bowers to perform its obligations hereunder. In no event shall Physician be liable for claims, damages, liabilities, costs or expenses related to Bowers failure to maintain confidentiality of patient medical records.

(F) <u>Governing Law</u>. This Agreement shall be interpreted, construed and governed under the laws of the State of Wisconsin.

(G) <u>Publicity; Advertising; Non-disclosure</u>. Physician agrees that it shall not advertise or publicly disclose in print or broadcast media intended for public dissemination the existence of this Agreement or any affiliation or relationship with Bowers or any Entity without the prior written consent of Bowers and the appropriate Entity. Both parties agree that it may use the others parties name in a general listing. In addition, Physician shall not discuss or disclose the fees herein with any other medical services Physician.

(H)   <u>Severability</u>.  In the event that any provision of this Agreement is found unenforceable by a court of competent jurisdiction, the remaining provisions hereof shall remain in full force and effect.

(I)   <u>Misrepresentation</u>.  Any misrepresentation of information set forth on <u>Exhibit C</u> the Physician Information Form, will permit Bowers to terminate this Agreement on written notice to Physician.  Physician authorizes Bowers to access the National Practitioner's Data concerning Practitioner and agrees to sign all documentation, consents and approvals requested by Bowers to confirm any information concerning Physician and the matters in this Agreement and its exhibits.

(J)   <u>Notices</u>.  All notices which are given by a party hereto shall be in writing and shall be personally delivered or sent by U.S. certified mail, return receipt requested,

> If to BOWERS:
>
> Bowers & Associates, Inc.
> 9779 S. Franklin Drive, Suite 100
> Franklin, WI 53132
> ATTN: Director, Provider Relations
>
> and if to Physician:
>
> CHILDREN'S MEDICAL GROUP
> 9000 W. Wisconsin Ave.
> P.O. Box 1997
> Milwaukee, WI 53201
> ATTN: Adminsitration
>
> Notice shall be deemed received for purposes of this Agreement when delivered (if hand delivered) or upon signing of (or refusal to sign) the return receipt.  Any party may change the address for notice by a notice given in conformance herewith.

(K)   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and it supersedes all prior and contemporaneous understandings, negotiations, and discussions, oral or written.  There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth herein.  This Agreement may only be amended in writing and signed by both parties.

(L)   <u>Assignment</u>.  Neither party may assign this Agreement or any interest herein or subcontract any services hereunder without the prior written consent of the other party. It is understood that Bowers may contract with Entities who may have become entitled to have their Beneficiaries receive Covered Services pursuant hereto.

(M)   <u>Ownership of Intellectual Property</u>.

a.   <u>Bowers' Intellectual Property</u>.  Physician agrees that Bowers shall remain the owner of any material or content provided under this Agreement by Bowers.  Any intellectual property rights, including but not limited to patent, trademark, copyright and trade secret rights, existing in any material or content provided by Bowers under this Agreement including, without limitation, the Paradigm Partners Tools provided hereunder, are the exclusive property of Bowers and Physician has and develops no ownership interest in such rights by virtue of this Agreement.  Physician agrees to cooperate with Bowers in protecting such intellectual property, including cooperation with the registration of Bowers of any intellectual property rights.

b.   <u>Physicians' Intellectual Property</u>.  Bowers agrees that Physician shall remain the owner of any material or content provided under this Agreement by Physician.  Any intellectual property rights, including but not limited to patent, trademark, copyright and trade secret rights, existing in any material or content provided by Physician under this Agreement are the exclusive property of Physician and Bowers has and develops no ownership interest in such rights by virtue of this Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

**BOWERS & ASSOCIATES, INC.**

By: _____

Its: _Efective VP_____

Date: _1-23-03_____

**CHILDREN'S MEDICAL GROUP**

By: _Thoms H Dmdy Js MD_____

Its: _PRESIDENT_____

Date: _1/6/03_____

TIN: _39-1789197_____

**EXHIBIT A**
Fee Schedule

**CHILDREN'S MEDICAL GROUP**

I.   Physician Professional Services, REDACTED discount off Actual Charges when billed under the Federal Tax Identification number.

**EXHIBIT B**

**CURRENT LIST OF ENTITIES**

(Bowers may modify the list at any time)

MEI, Inc.
A & E Manufacturing, Incorporated
Andis Company
City of Racine – Wisconsin
County of Racine – Wisconsin
In-Sink-Erator, a division of Emerson Electric Co.
Johnson International, Inc.
LDV, Inc.
Racine Unified School District
S. C. Johnson and Son, Inc.
JohnsonDiversey, Inc.
Simplicity Manufacturing, Inc.
VPI, LLC
Bay West Paper Corporation
County Concrete Industries
Fiskars Brands, Inc.
Greenheck Fan Corporation
Kolbe & Kolbe Millworks, Co., Inc.
L & S Electric
Marathon Cheese Corporation
Marathon County
Marathon Electric Manufacturing Corporation
Mid-Wisconsin Bank
Menzner Lumber & Supply Company
Northcentral Technical College
Packaging Tape, Inc.
SNE Enterprises, Inc./The Peachtree Companies, Inc.
Wausau – Mosinee Paper Corporation
Wausau Benefits, Inc.
Wausau Concrete Industries

**Exhibit C**
**CHILDREN'S HEALTH SYSTEM**
**Physician Information Form**

Exhibit C –  Page 1

# Children's Medical Group
## Summary of CMG's Most Common Procedures
### Effective January 1, 2003

__Exhibit A__

| Description | CPT-4 Code | 2003 CMG CHARGES | 2003 Allowable CHARGES |
|---|---|---|---|
| Office Visit Level 3 - New | 99203 | | |
| Office Visit Level 1 - Established | 99211 | | |
| Office Visit Level 2 - Established | 99212 | | |
| Office Visit Level 3 - Established | 99213 | | |
| Office Visit Level 4 - Established | 99214 | | |
| Initial Eval/Mgmt: Under 1 | 99381 | | |
| Est Eval/Mgmt: Under 1 | 99391 | | |
| Est Eval/Mgmt: 1 - 4 | 99392 | | |
| Est Eval/Mgmt: 5 - 11 | 99393 | | |
| Est Eval/Mgmt: 12 - 17 | 99394 | | |
| Hospital Newborn Care | 99431 | | |
| Blood, routine collection | 36415 | | |
| Urinalysis w/o Microscopy | 81002 | | |
| Strep Culture | 87081 | | |
| Rapid Strep | 87880 | | |
| Immuniz Admin, 1 or combo vacc | 90471 | | |
| Immuniz Admin, each add'l vacc | 90472 | | |
| HIB, Series of 4 | 90645 | | |
| Flu Vaccine - over 3 years old | 90658 | | |
| Pneumococcal conjugate vaccine | 90669 | | |
| DTaP | 90700 | | |
| MMR | 90707 | | |
| Injectible Polio | 90713 | | |
| Varicella | 90716 | | |
| Meningococcal Polysaccha | 90733 | | |
| Hepatitis B: 0 - 11 | 90744 | | |
| Hep B + HIB Vaccine | 90748 | | |
| Lab Handling | 99000 | | |
| Office Visit - After hours & Sat | 99050 | | |
| Office Visit - Sunday & Holidays | 99054 | | |
| Office Visit - Emergency basis | 99058 | | |



dgt/managedcare/2003/ChildrenMedicalGroup 2003 fee schedule.xls
1/29/2003